GENERAL MOTORS CORP. *v.* TRACY, TAX
COMMISSIONER OF OHIO

No. 95–1232.   Argued October 7, 1996—Decided February 18, 1997

*Timothy B. Dyk* argued the cause for petitioner. With him on the briefs were *Gregory A. Castanias* and *John C. Duffy, Jr.*

*Jeffrey S. Sutton*, State Solicitor of Ohio, argued the cause for respondent. With him on the brief were *Betty D. Montgomery*, Attorney General, and *Barton A. Hubbard, Robert C. Maier, Paul A. Colbert*, and *Thomas McNamee*, Assistant Attorneys General.*

JUSTICE SOUTER delivered the opinion of the Court.

The State of Ohio imposes its general sales and use taxes on natural gas purchases from all sellers, whether in-state or

---

*Briefs of *amici curiae* urging reversal were filed for the Chamber of Commerce of the United States et al. by *Walter Hellerstein, Carter G. Phillips, Rebecca H. Noecker, Karen L. Pauley, Robin S. Conrad*, and *Jan S. Amundson;* and for the Process Gas Consumers Group et al. by *Jerome B. Libin* and *William H. Penniman.*

Briefs of *amici curiae* urging affirmance were filed for the State of Kansas et al. by *Carla J. Stovall*, Attorney General of Kansas, and *Stephen R. McAllister*, Special Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Daniel E. Lungren* of California, *Richard Blumenthal* of Connecticut, *James E. Ryan* of Illinois, *Frankie Sue Del Papa* of Nevada, *Heidi Heitkamp* of North Dakota, *James S. Gilmore III* of Virginia, and *Darrell V. McGraw, Jr.*, of West Virginia; for the National Association of Regulatory Utility Commissioners by *William Paul Rodgers, Jr.;* and for Columbia Gas of Ohio, Inc., by *Kenneth W. Christman.*

*Paull Mines* and *Richard D. Pomp* filed a brief for the Multistate Tax Commission as *amicus curiae.*

out-of-state, except regulated public utilities that meet
Ohio's statutory definition of a "natural gas company." The
question here is whether this difference in tax treatment be-
tween sales of gas by domestic utilities subject to regulation
and sales of gas by other entities violates the Commerce
Clause or Equal Protection Clause of the Constitution. We
hold that it does not.

## I

During the tax period at issue,[1] Ohio levied a 5% tax on
the in-state sales of goods, including natural gas, see Ohio
Rev. Code Ann. §§ 5739.02, 5739.025 (Supp. 1990), and it im-
posed a parallel 5% use tax on goods purchased out-of-state
for use in Ohio. See § 5741.02 (1986). Local jurisdictions
were authorized to levy certain additional taxes that in-
creased these sales and use tax rates to as much as 7% in
some municipalities. See § 5739.025 (Supp. 1990); Reply
Brief for Petitioner 13, n. 11.

Since 1935, when Ohio's first sales and use taxes were
imposed, the State has exempted natural gas sales by "nat-
ural gas compan[ies]" from all state and local sales taxes.
§ 5739.02(B)(7).[2] Under Ohio law, "[a]ny person . . . [i]s a
natural gas company when engaged in the business of sup-
plying natural gas for lighting, power, or heating purposes
to consumers within this state." § 5727.01(D)(4) (1996); see
also § 5727.01(E)(4) (Supp. 1990); § 5727.01(E)(8) (1986). It
is undisputed that natural gas utilities (generally termed
"local distribution companies" or LDC's) located in Ohio sat-
isfy this definition of "natural gas company." The Supreme
Court of Ohio has, however, interpreted the statutory term
to exclude non-LDC gas sellers, such as producers and inde-
pendent marketers, see *Chrysler Corp.* v. *Tracy*, 73 Ohio St.

---

[1] The natural gas purchases that gave rise to petitioner's challenge were
made during the period from October 1, 1986, to June 30, 1990.

[2] The exemption was originally codified at Ohio Gen. Code Ann. § 5546-
2(6) (Baldwin 1952). As part of a general recodification in 1953, it was
moved to Ohio Rev. Code Ann. § 5739.02(B)(7), where it remains today.

3d 26, 652 N. E. 2d 185 (1995), and the State has accordingly treated their sales as outside the exemption and so subject to the tax.

The very question of such an exclusion, and consequent taxation of gas sales or use, reflects a recent stage of evolution in the structure of the natural gas industry. Traditionally, the industry was divisible into three relatively distinct segments: producers, interstate pipelines, and LDC's. This market structure was possible largely because the Natural Gas Act of 1938 (NGA), 52 Stat. 821, 15 U. S. C. § 717 *et seq.*, failed to require interstate pipelines to offer transportation services to third parties wishing to ship gas. As a result, "interstate pipelines [were able] to use their monopoly power over gas transportation to create and maintain monopsony power in the market for the purchase of gas at the wellhead and monopoly power in the market for the sale of gas to LDCs." Pierce, The Evolution of Natural Gas Regulatory Policy, 10 Nat. Resources & Env't 53, 53–54 (Summer 1995) (hereinafter Pierce). For the most part, then, producers sold their gas to the pipelines, which resold it to utilities, which in turn provided local distribution to consumers. See, *e. g., Associated Gas Distributors* v. *FERC,* 824 F. 2d 981, 993 (CADC 1987), cert. denied, 485 U. S. 1006 (1988); Mogel & Gregg, Appropriateness of Imposing Common Carrier Status on Interstate Natural Gas Pipelines, 4 Energy L. J. 155, 157 (1983).

Congress took a first step toward increasing competition in the natural gas market by enacting the Natural Gas Policy Act of 1978, 92 Stat. 3350, 15 U. S. C. § 3301 *et seq.,* which was designed to phase out regulation of wellhead prices charged by producers of natural gas, and to "promote gas transportation by interstate and intrastate pipelines" for third parties. 57 Fed. Reg. 13271 (1992). Pipelines were reluctant to provide common carriage, however, when doing so would displace their own sales, see *Associated Gas Distributors* v. *FERC, supra,* at 993, and in 1985, the Federal

Energy Regulatory Commission (FERC) took the further step of promulgating Order No. 436, which contained an "open access" rule providing incentives for pipelines to offer gas transportation services, see 50 Fed. Reg. 42408. In 1992, this evolution culminated in FERC's Order No. 636, which required all interstate pipelines to "unbundle" their transportation services from their own natural gas sales and to provide common carriage services to buyers from other sources that wished to ship gas. See 57 Fed. Reg. 13267.

Although FERC did not take the further step of requiring intrastate pipelines to provide local transportation services to ensure that gas sold by producers and independent marketers could get all the way to the point of consumption,[3] under the system of open access to interstate pipelines that had emerged in the mid-1980's "larger industrial end-users" began increasingly to bypass utilities' local distribution networks by "construct[ing] their own pipeline spurs to [interstate] pipeline[s] . . . ." Fagan, From Regulation to Deregulation: The Diminishing Role of the Small Consumer Within the Natural Gas Industry, 29 Tulsa L. J. 707, 723 (1994). Bypass posed a problem for LDC's, since the departure of large end users from the system left the same fixed costs to be spread over a smaller customer base. The State of Ohio consequently took steps in 1986 to keep some income from large industrial customers within the utility system by adopting regulations that allowed industrial end users in Ohio to buy natural gas from producers or independent marketers, pay interstate pipelines for interstate transportation, and pay LDC's for local transportation. See *In re Commis-*

---

[3] Section 1(b) of the NGA, 52 Stat. 821, 15 U. S. C. § 717(b), explicitly exempts "local distribution of natural gas" from federal regulation. In addition, the Hinshaw Amendment to the NGA, 15 U. S. C. § 717(c), exempts from FERC regulation intrastate pipelines that operate exclusively in one State and with rates and service regulated by the State. See *ANR Pipeline Co.* v. *FERC,* 71 F. 3d 897, 898, n. 2 (CADC 1995). See also *infra,* at 293.

*sion Ordered Investigation of the Availability of Gas Transportation Service Provided by Ohio Gas Distribution Utilities to End-Use Customers,* No. 85–800–GA–COI (Ohio Pub. Util. Comm'n, Apr. 15, 1986); see generally Natural Gas Marketing and Transportation Committee, 1990 Annual Report, in Natural Resources Energy and Environmental Law, 1990 Year in Review 57, 91–92, and n. 207 (1991).

This new market structure led to the question whether purchases from non-LDC sellers of natural gas qualified for the state sales tax exemption under Ohio Rev. Code Ann. § 5739.02(B)(7) (Supp. 1990). In *Chrysler Corp.* v. *Tracy,* the Ohio Supreme Court held that they do not. The court reasoned that independent marketers do not "suppl[y]" natural gas as required by § 5727.01(D)(4), because they do "not own or control any physical assets to . . . distribute natural gas." 73 Ohio St. 3d, at 28, 652 N. E. 2d, at 187. This determination of state law led in turn to the case before us now.

During the tax period in question here, petitioner General Motors Corporation (GMC) bought virtually all the natural gas for its Ohio plants from out-of-state marketers, not LDC's.[4] Respondent Tax Commissioner of Ohio applied the State's general use tax to GMC's purchases, and the State Board of Tax Appeals sustained that action. GMC appealed to the Supreme Court of Ohio on two grounds. GMC first contended that its purchases should be exempt from the sales tax because independent marketers fell within the statutory definition of "natural gas company." The State Supreme Court, citing its decision the same day in *Chrysler,* rejected this argument. See *General Motors Corp.* v. *Tracy,* 73 Ohio St. 3d 29, 30, 652 N. E. 2d 188, 189 (1995). GMC also argued that denying the tax exemption to sales by marketers violated the Commerce and Equal Protection Clauses. The Ohio court initially concluded that the State's

---

[4] App. 156. Pursuant to Ohio's regulations authorizing LDC's to provide local transportation services, GMC took delivery of much of this gas from local utilities. *Id.,* at 156–157.

regime did not violate the Commerce Clause because Ohio taxes sales by "compan[ies] that d[o] not own any production, transportation, or distribution equipment" at the same rate regardless of "whether [the companies sell] natural gas in-state or out-of-state." *Id.*, at 31, 652 N. E. 2d, at 190. The court then stepped back to rule, however, that GMC lacked standing to bring its Commerce Clause challenge:

> "On close inspection, GM actually argues that the commissioner's application burdens out-of-state vendors of natural gas. However, GM is not a member of that class and lacks standing to challenge the constitutionality of this application on that basis; our further comment on this question is inappropriate." *Ibid.*

Finally, the court dismissed GMC's equal protection claim as "submerged in its Commerce Clause argument." *Id.*, at 31–32, 652 N. E. 2d, at 190. We granted GMC's petition for certiorari to address the question of standing as well as the Commerce and Equal Protection Clause issues. 517 U. S. 1118 (1996).

## II

The Supreme Court of Ohio held GMC to be without standing to raise this Commerce Clause challenge because the company is not one of the sellers said to suffer discrimination under the challenged tax laws. But cognizable injury from unconstitutional discrimination against interstate commerce does not stop at members of the class against whom a State ultimately discriminates, and customers of that class may also be injured, as in this case where the customer is liable for payment of the tax and as a result presumably pays more for the gas it gets from out-of-state producers and marketers. Consumers who suffer this sort of injury from regulation forbidden under the Commerce Clause satisfy the standing requirements of Article III. See generally *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561 (1992).

On similar facts, we held in *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984), that in-state liquor wholesalers had standing to raise a Commerce Clause challenge to a Hawaii tax regime exempting certain alcohols produced in-state from liquor taxes. Although the wholesalers were not among the class of out-of-state liquor producers allegedly burdened by Hawaii's law, we reasoned that the wholesalers suffered economic injury both because they were directly liable for the tax and because the tax raised the price of their imported goods relative to the exempted in-state beverages. *Id.*, at 267; see also *Fulton Corp.* v. *Faulkner*, 516 U. S. 325 (1996) (in-state stockholder challenged tax regime imposing higher taxes on stock from issuers with out-of-state operations than on stock from purely in-state issuers); *West Lynn Creamery, Inc.* v. *Healy*, 512 U. S. 186 (1994) (in-state milk dealers challenged tax and subsidy scheme discriminating against out-of-state milk producers). *Bacchus* applies with equal force here, and GMC "plainly ha[s] standing to challenge the tax in this Court," *Bacchus Imports* v. *Dias, supra*, at 267. We therefore turn to the merits.

## III

### A

The negative or dormant implication of the Commerce Clause prohibits state taxation, see, *e. g., Quill Corp.* v. *North Dakota*, 504 U. S. 298, 312–313 (1992), or regulation, see, *e. g., Brown-Forman Distillers Corp.* v. *New York State Liquor Authority*, 476 U. S. 573, 578–579 (1986), that discriminates against or unduly burdens interstate commerce and thereby "imped[es] free private trade in the national marketplace," *Reeves, Inc.* v. *Stake*, 447 U. S. 429, 437 (1980). GMC claims that Ohio's differential tax treatment of natural gas sales by marketers and regulated local utilities constitutes "facial" or "patent" discrimination in violation of the Commerce Clause, and it argues that differences in the nature of the businesses of LDC's and interstate marketers

cannot justify Ohio's differential treatment of these in-state and out-of-state entities. Although the claim is not that the Ohio tax scheme distinguishes in express terms between in-state and out-of-state entities, GMC argues that by granting the tax exemption solely to LDC's, which are in fact all located in Ohio, the State has "favor[ed] some in-state commerce while disfavoring all out-of-state commerce," Brief for Petitioner 16. That is, because the favored entities are all located within the State, "the tax exemption did not need to be drafted explicitly along state lines in order to demonstrate its discriminatory design," *Amerada Hess Corp.* v. *Director, Div. of Taxation, N. J. Dept. of Treasury,* 490 U. S. 66, 76 (1989). Assessing these arguments requires an understanding of the historical development of the contemporary retail market for natural gas, to which we referred before and now turn in greater detail.

## B

Since before the Civil War, gas manufactured from coal and other commodities had been used for lighting purposes, and of course it was understood that natural gas could be used the same way. See Dorner, Initial Phases of Regulation of the Gas Industry, in 1 Regulation of the Gas Industry §§ 2.03–2.06 (American Gas Assn. 1996) (hereinafter Dorner). By the early years of this century, areas in "proximity to the gas field[s]," *West* v. *Kansas Natural Gas Co.,* 221 U. S. 229, 246 (1911), did use natural gas for fuel, but it was not until the 1920's that the development of high-tensile steel and electric welding permitted construction of high-pressure pipelines to transport natural gas from gas fields for distant consumption at relatively low cost. Pierce 53. By that time, the States' then-recent experiments with free market competition in the manufactured gas and electricity industries had dramatically underscored the need for comprehensive regulation of the local gas market. Companies supplying manufactured gas proliferated in the latter half of the 19th century

and, after initial efforts at regulation by statute at the state level proved unwieldy, the States generally left any regulation of the industry to local governments. See Dorner §§ 2.03, 2.04. Many of those municipalities honored the tenets of laissez-faire to the point of permitting multiple gas franchisees to serve a single area and relying on competition to protect the public interest. *Ibid.* The results were both predictable and disastrous, including an initial period of "wasteful competition,"[5] followed by massive consolidation and the threat of monopolistic pricing.[6] The public suffered through essentially the same evolution in the electric industry.[7] Thus, by the time natural gas became a widely mar-

---

[5] During this period, " '[t]he public grew weary of the interminable rate wars which were invariably followed by a period of recoupment during which the victorious would attempt to make the price of the battle of the consumers by way of increased rates. Investors suffered heavy losses through the manipulation of fly-by-night paper concerns operating with 'nuisance' franchises. . . . Everybody suffered the inconvenience of city streets being constantly torn up and replaced by installation and relocation of duplicate facilities. The situation in New York City alone, prior to the major gas company consolidations, threatened municipal chaos.' " Dorner § 2.03 (quoting Welch, The Odyssey of Gas—A Record of Industrial Courage, 24 Pub. Utils. Fortnightly 500, 501–502 (1939)).

[6] Reticence was not the order of the day. When, for example, the last two surviving gas companies supplying the citizens of Brooklyn announced their merger in October 1883, they also announced that gas prices would immediately double. Dorner § 2.03.

[7] The electric industry burgeoned following Thomas Edison's patent on the first incandescent electric lamp in 1878. Dorner, Beginnings of the Gas Industry, in 1 Regulation of the Gas Industry § 1.06 (American Gas Assn. 1996). Again, after an initial period of unsuccessful regulation by state statute, States mostly left regulation of the electric industry to municipal or local government. Swartwout, Current Utility Regulatory Practice from a Historical Perspective, 32 Nat. Res. J. 289, 298 (1992). "[M]ultiple franchises were handed out, and duplicative utility systems came into being." *Id.,* at 299. The results were "ruinous and short lived." *Ibid.* For example, 45 mostly overlapping franchises were granted for electric utility operation in Chicago between 1882 and 1905. By 1905, however, a single monopoly entity had emerged from the chaos, and customers ended up paying monopoly prices. *Id.,* at 300.

ketable commodity, the States had learned from chastening experience that public streets could not be continually torn up to lay competitors' pipes, that investments in parallel delivery systems for different fractions of a local market would limit the value to consumers of any price competition, and that competition would simply give over to monopoly in due course. It seemed virtually an economic necessity for States to provide a single, local franchise with a business opportunity free of competition from any source, within or without the State, so long as the creation of exclusive franchises under state law could be balanced by regulation and the imposition of obligations to the consuming public upon the franchised retailers.

Almost as soon as the States began regulating natural gas retail monopolies, their power to do so was challenged by interstate vendors as inconsistent with the dormant Commerce Clause. While recognizing the interstate character of commerce in natural gas, the Court nonetheless affirmed the States' power to regulate, as a matter of local concern, all direct sales of gas to consumers within their borders, absent congressional prohibition of such state regulation. See, *e. g.*, *Pennsylvania Gas Co.* v. *Public Serv. Comm'n of N. Y.*, 252 U. S. 23, 28–31 (1920); *Public Util. Comm'n of Kan.* v. *Landon*, 249 U. S. 236, 245–246 (1919). At the same time, the Court concluded that the dormant Commerce Clause prevents the States from regulating interstate transportation or sales for resale of natural gas. See, *e. g.*, *Missouri ex rel. Barrett* v. *Kansas Natural Gas Co.*, 265 U. S. 298, 307–310 (1924); *Pennsylvania* v. *West Virginia*, 262 U. S. 553, 596–600, reaffirmed on rehearing, 263 U. S. 350 (1923). See generally *Illinois Natural Gas Co.* v. *Central Ill. Public Service Co.*, 314 U. S. 498, 504–505 (1942) (summarizing prior cases distinguishing between permissible and impermissible state regulation of commerce in natural gas). Thus, the Court never questioned the power of the States to regulate retail

sales of gas within their respective jurisdictions. Dorner § 2.06.[8]

When federal regulation of the natural gas industry finally began in 1938, Congress, too, clearly recognized the value of such state-regulated monopoly arrangements for the sale and distribution of natural gas directly to local consumers. Thus, § 1(b) of the NGA, 15 U. S. C. § 717(b), explicitly exempted "local distribution of natural gas" from federal regulation, even as the NGA authorized the Federal Power

---

[8] In *Arkansas Elec. Cooperative Corp.* v. *Arkansas Pub. Serv. Comm'n*, 461 U. S. 375 (1983), we rejected the bright-line distinction between wholesale and retail sales drawn by these older cases and concluded that state regulation of wholesale sales of electricity transmitted in interstate commerce is not precluded by the Commerce Clause. Reasoning that utilities should not be insulated from our contemporary dormant Commerce Clause jurisprudence by formalistic judge-made rules, *id.*, at 391, we looked instead to "'the nature of the state regulation involved, the objective of the state, and the effect of the regulation upon the national interest in the commerce,'" *id.*, at 390 (quoting *Illinois Natural Gas Co.* v. *Central Ill. Public Service Co.*, 314 U. S. 498, 505 (1942)), to determine whether States have a sufficient interest in regulating wholesale rates within their borders, and had no problem concluding that States do indeed have such an interest, with the result that state regulation of wholesale rates is not precluded by the Commerce Clause (in the absence of pre-emptive congressional action), *id.*, at 394–395. While the holding of *Arkansas Electric* thereby expanded both the permissible scope of state utility regulation and judicial recognition of the important state interests in such regulation, the reasoning of the case equally implies that state regulation of retail sales is not, as a constitutional matter, immune from our ordinary Commerce Clause jurisprudence, and to the extent that our earlier cases may have implied such immunity they are no longer good law. Nothing in *Arkansas Electric* undermines the earlier cases' recognition of the powerful state interest in regulating sales to domestic consumers buying at retail, however, which we reaffirm here. In addition, *Arkansas Electric* does not disturb the relevance of the wholesale/retail distinction for construing the jurisdictional provisions of statutes such as the NGA, which we discuss immediately below. See *id.*, at 380, and n. 3; see also *Schneidewind* v. *ANR Pipeline Co.*, 485 U. S. 293, 300–301 (1988) ("The NGA confers upon FERC exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale").

Commission (FPC) to begin regulating interstate pipelines. Congress's purpose in enacting the NGA was to fill the regulatory void created by the Court's earlier decisions prohibiting States from regulating interstate transportation and sales for resale of natural gas, while at the same time leaving undisturbed the recognized power of the States to regulate all in-state gas sales directly to consumers. *Panhandle Eastern Pipe Line Co.* v. *Public Serv. Comm'n of Ind.*, 332 U. S. 507, 516–522 (1947). Thus, the NGA "was drawn with meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way," *id.*, at 517–518; "the scheme was one of cooperative action between federal and state agencies" to "protect consumers against exploitation at the hands of natural gas companies," *id.*, at 520 (internal quotation marks omitted); and "Congress' action . . . was an unequivocal recognition of the vital interests of the states and their people, consumers and industry alike, in the regulation of rates and service," *id.*, at 521; see also *Panhandle Eastern Pipe Line Co.* v. *Michigan Pub. Serv. Comm'n*, 341 U. S. 329, 334 (1951) ("Direct sales [of natural gas] for consumptive use were designedly left to state regulation" by the NGA). Indeed, the Court has construed § 1(b) of the NGA as altogether exempting state regulation of in-state retail sales of natural gas from attack under the dormant Commerce Clause:

> "The declaration [in the NGA], though not identical in terms with the one made by the McCarran Act, 59 Stat. 33, 15 U. S. C. § 1011, concerning continued state regulation of the insurance business, is in effect equally clear, in view of the [NGA's] historical setting, legislative history and objects, to show intention for the states to continue with regulation where Congress has not expressly taken over. Cf. *Prudential Ins. Co.* v. *Benjamin*, 328 U. S. 408 [(1946) (upholding discriminatory state taxation of out-of-state insurance companies as authorized

by the McCarran Act)]." *Panhandle-Indiana, supra,* at 521.

And Congress once again acknowledged the important role of the States in regulating intrastate transportation and distribution of natural gas in 1953 when, in the wake of a decision of this Court permitting the FPC to regulate intrastate gas transportation by LDC's, see *FPC* v. *East Ohio Gas Co.,* 338 U. S. 464 (1950), Congress amended the NGA to "leav[e] jurisdiction" over "companies engaged in the distribution" of natural gas "exclusively in the States, as always has been intended." S. Rep. No. 817, 83d Cong., 1st Sess., 1–2 (1953); see 15 U. S. C. § 717(c).

For 40 years, the complementary federal regulation of the interstate market and congressionally approved state regulation of the intrastate gas trade thus endured unchanged in any way relevant to this case. The resulting market structure virtually precluded competition between LDC's and other potential suppliers of natural gas for direct sales to consumers, including large industrial consumers. The simplicity of this dual system of federal and state regulation began to erode in 1978, however, when Congress first encouraged interstate pipelines to provide transportation services to end users wishing to ship gas,[9] and thereby moved toward providing a real choice to those consumers who were able to buy gas on the open market and were willing to take it free of state-created obligations to the buyer. The upshot of congressional and regulatory developments over the next 15 years was increasing opportunity for a consumer in that class to choose between gas sold by marketers and gas bundled with rights and benefits mandated by state regulators as sold by LDC's. But amidst such changes, two things remained the same throughout the period involved in this case. Con-

---

[9] For a more complete description of these changes in federal regulatory policy, and the relevant modifications of Ohio regulation of local utilities that they prompted, see *supra,* at 283–285.

gress did nothing to limit the States' traditional autonomy to authorize and regulate local gas franchises, and the local franchised utilities (though no longer guaranteed monopolies as to all natural gas demand) continued to provide bundled gas to the vast majority of consumers who had neither the capacity to buy on the interstate market nor the resilience to forgo the reliability and protection that state regulation provided.

To this day, all 50 States recognize the need to regulate utilities engaged in local distribution of natural gas.[10]

--------

[10] Alabama: Ala. Code § 37–4–1(7)(b) (Supp. 1996); see generally §§ 37–1–80 through 37–1–105 (1992 and Supp. 1996); Alaska: Alaska Stat. Ann. §§ 42.05.141, 42.05.291, 42.05.990(4)(D) (1989 and Supp. 1995); see generally §§ 42.05.010–42.05.995; Arizona: Ariz. Rev. Stat. Ann. §§ 40–201.4, 40–203 (1996); see generally §§ 40–201 through 40–495; Arkansas: Ark. Code Ann. §§ 23–1–101(4)(A)(i), 23–4–101 (1987 and Supp. 1995); see generally §§ 23–1–101 through 23–4–637; California: Cal. Pub. Util. Code Ann. §§ 216, 701 (West 1975 and Supp. 1996); see generally §§ 201 through 882 (West 1975 and Supp. 1996), §§ 1001 through 1906 (West 1994 and Supp. 1996); Colorado: Colo. Rev. Stat. §§ 40–1–103(1)(a), 40–3–101 (1993); see generally §§ 40–1–101 through 40–8.5–107 (1993 and Supp. 1996); Connecticut: Conn. Gen. Stat. Ann. §§ 16–1(a)(4), (9), 16–6b (West 1988 and Supp. 1996); see generally §§ 16–1 through 16–50f; Delaware: Del. Code Ann., Tit. 26, § 102(2) (Supp. 1996); see generally Tit. 26, §§ 101 through 511 (1989 and Supp. 1996); District of Columbia: D. C. Code Ann. §§ 43–203, 43–212 (1990); see generally §§ 43–101 through 43–1107 (1990 and Supp. 1996); Florida: Fla. Stat. Ann. §§ 366.02(1), 366.03 (West Supp. 1997); see generally §§ 366.01 through 366.14 (West 1968 and Supp. 1997); Georgia: Ga. Code Ann. § 46–2–20(a) (1992); see generally §§ 46–2–20 through 46–2–94 (1992 and Supp. 1996); Hawaii: Haw. Rev. Stat. Ann. §§ 269–1, 269–6, 269–16 (Michie 1992 and Supp. 1996); see generally §§ 269–1 through 269–32; Idaho: Idaho Code §§ 61–129, 61–501, 61–502 (1994); see generally §§ 61–101 through 61–714; Illinois: Ill. Comp. Stat., ch. 220, §§ 5/3–105, 5/4–101, 5/9–101 (1994); see generally ch. 220, §§ 5/1–101 through 5/10–204; Indiana: Ind. Code §§ 8–1–2–1, 8–1–2–4, 8–1–2–87 (West Supp. 1996); see generally §§ 8–1–2–1 through 8–1–2–127; Iowa: Iowa Code Ann. § 476.1 (West Supp. 1996); see generally §§ 476.1 through 476.66 (West 1991 and Supp. 1996); Kansas: Kan. Stat. Ann. §§ 66–104, 66–1,200 through 66–1,208 (1985 and Supp. 1995); Kentucky: Ky. Rev. Stat. Ann. § 278.010(3)(c) (Baldwin 1992); see generally §§ 278.010 through 278.450; Louisiana: La. Rev.

Ohio's treatment of its gas utilities has been a typical blend of limitation and affirmative obligation. Its natural gas utilities, during the period in question, bore with a variety of

Stat. Ann. § 33:4161 (West 1988); see generally §§ 33:4161 through 33:4174, 33:4301 through 33:4308, 33:4491 through 33:4496 (West 1988 and Supp. 1996); Maine: Me. Rev. Stat. Ann., Tit. 35–A, §§ 102, 103, 301 (1988 and Supp. 1996–1997); see generally Tit. 35–A, §§ 101–1210; Maryland: Md. Ann. Code, Art. 78, §§ 1, 2(o) (1991); see generally Art. 78, §§ 1 through 2, 23 through 27A, 51 through 54K, 68 through 88 (1991 and Supp. 1994); Massachusetts: Mass. Gen. Laws §§ 164:1, 164:93, 164:94 (1994); see generally ch. 164, §§ 1 through 128; Michigan: Mich. Comp. Laws Ann. §§ 460.6–460.6b (West 1991 and Supp. 1996–1997); see generally §§ 460.1 through 460.8; Minnesota: Minn. Stat. Ann. §§ 216B.02(4), 216B.03 (West 1992); see generally §§ 216B.01 through 216B.67 (1994 and Supp. 1995); Mississippi: Miss. Code Ann. §§ 77–3–3(d)(ii), 77–3–5 (1991 and Supp. 1996); see generally §§ 77–3–1 through 77–3–307; Missouri: Mo. Rev. Stat. §§ 386.020, 393.130 (1994); see generally §§ 386.010 through 386.710, 393.010 through 393.770; Montana: Mont. Code Ann. §§ 69–3–101, 69–3–102, 69–3–201 (1995); see generally §§ 69–3–101 through 69–3–713; Nebraska: Neb. Rev. Stat. § 14–2119 (Supp. 1996); see generally §§ 19–4601 through 19–4623 (1991 and Supp. 1996); Nevada: Nev. Rev. Stat. Ann. § 704.020(2)(a) (1995); see generally §§ 704.001 through 704.320, 704.755; New Hampshire: N. H. Rev. Stat. Ann. §§ 362:2, 374:1, 374:2 (1995); see generally §§ 378:1 through 378:42; New Jersey: N. J. Stat. Ann. § 48:2–13 (West Supp. 1996); see generally §§ 48:2–13 through 48:2–91, 48:9–5 through 48:9–32 (West 1969 and Supp. 1996–1997); New Mexico: N. M. Stat. Ann. §§ 62–3–3, 62–6–4, 62–8–1 (1993 and Supp. 1996); see generally §§ 62–1–1 through 62–13–14; New York: N. Y. Pub. Serv. Law § 65 (McKinney 1989); see generally §§ 30 through 52, 64 through 77 (McKinney 1989 and Supp. 1996); North Carolina: N. C. Gen. Stat. §§ 62–3(23), 62–30 (1989 and Supp. 1996); see generally §§ 62–1 through 62–171; North Dakota: N. D. Cent. Code §§ 49–02–01, 49–02–02, 49–04–02 (1978 and Supp. 1995); see generally §§ 49–02–01 through 49–07–06; Ohio: Ohio Rev. Code Ann. §§ 4905.03(A)(6), 4905.04, 4905.22 (1991); see generally §§ 4901.01–4909.99 (Baldwin 1991 and Supp. 1995); Oklahoma: Okla. Stat., Tit. 17, §§ 15, 152, 160.1 (West 1986 and Supp. 1997); Oregon: Ore. Rev. Stat. §§ 757.005, 757.020, 756.040 (1991); see generally §§ 756.010 through 757.991; Pennsylvania: Pa. Stat. Ann., Tit. 66, §§ 102, 501, 1301 (Purdon 1979 and Supp. 1996–1997); see generally Tit. 66, §§ 101 through 2107; Rhode Island: R. I. Gen. Laws §§ 39–1–2(7), 39–1–3(a) (Supp. 1996); see generally §§ 39–1–1 through 39–2–19 (1990 and Supp. 1996); South Carolina: S. C. Code Ann. §§ 58–5–10(3), 58–5–210 (1976 and

requirements: they had to submit annual forecasts of future supply and demand for gas, Ohio Rev. Code Ann. § 4905.14 (Supp. 1990), comply with a range of accounting, reporting, and disclosure rules, §§ 4905.14, 4905.15 (1977 and Supp. 1990), and get permission from the state Public Utilities Commission to issue securities and even to enter certain contracts, §§ 4905.40, 4905.41, 4905.48. The "just and reasonable" rates to which they were restricted, see §§ 4905.22, 4905.32, 4909.15, 4909.17, included a single average cost of gas, see Ohio Admin. Code 4901:1–14, Ohio Monthly Record (Nov. 1991), together with a limited return on investment.[11]

---

Supp. 1995); see generally §§ 58–5–10 through 58–5–1070; South Dakota: S. D. Codified Laws §§ 49–34A–1, 49–34A–4, 49–34A–6 (1993 and Supp. 1996); see generally §§ 49–34A–1 through 49–34A–78; Tennessee: Tenn. Code Ann. §§ 65–4–101, 65–5–201 (Supp. 1996); see generally §§ 65–4–101 through 65–5–205 (1993 and Supp. 1996); Texas: Tex. Rev. Civ. Stat. Ann., Art. 6050, § 1(a)(4), Art. 6053 (Vernon Supp. 1996–1997); see generally Arts. 6050 through 6066g (Vernon 1962 and Supp. 1996–1997); Utah: Utah Code Ann. §§ 54–2–1(8), 54–3–1, 54–4–1 (1994 and Supp. 1996); see generally §§ 54–2–1 through 54–4–30; Vermont: Vt. Stat. Ann., Tit. 30, § 215 (1986); Virginia: Va. Code Ann. §§ 56–232, 56–234 (1995); see generally §§ 56–232 through 56–260.1 (1995 and Supp. 1996); Washington: Wash. Rev. Code §§ 80.04.010, 80.28.020 (West 1991 and Supp. 1996–1997); see generally §§ 80.04.010 through 80.04.520, 80.28.010 through 80.28.260; West Virginia: W. Va. Code § 24–2–1 (1992); see generally §§ 24–1–1 through 24–5–1 (1992 and Supp. 1996); Wisconsin: Wis. Stat. Ann. §§ 196.01(5), 196.02, 196.03 (West 1992 and Supp. 1996–1997); see generally §§ 196.01 through 196.98; Wyoming: Wyo. Stat. §§ 37–1–101(a)(vi)(D), 37–2–112 (1996); see generally §§ 37–1–101 through 37–6–107.

[11] Ohio's Amended Substitute House Bill 476, signed into law in 1996, requires the state Public Utilities Commission to exempt certain sales of natural gas and/or related services by an LDC from this rate regulation if the commission finds that the LDC is subject to effective competition with respect to such service and that the customers for such service have reasonably available alternatives, Ohio Rev. Code Ann. § 4929.04, as amended by H. R. 476, § 1, effective Sept. 17, 1996. Although this law had not been enacted at the time of the purchases involved in this case, petitioner contended at oral argument that during the tax period in question here, Ohio permitted some natural gas sales by public utilities at unregulated, negotiated rates, and that those sales were not subject to

The LDC's could not exact "a greater or lesser compensation for any services rendered . . . than [exacted] . . . from any other [customer] for doing a like and contemporaneous service under substantially the same circumstances and conditions." Ohio Rev. Code Ann. § 4905.33 (Supp. 1990).

The State also required LDC's to serve all members of the public, without discrimination, throughout their fields of operations. See, e. g., *Industrial Gas Co.* v. *Public Utilities Comm'n of Ohio*, 135 Ohio St. 408, 21 N. E. 2d 166 (1939). They could not "pick out good portions of a particular territory, serve only select customers under private contract, and refuse service . . . to . . . other users," *id.*, at 413, 21 N. E. 2d, at 168, or terminate service except for reasons defined by statute and by following statutory procedures, Ohio Rev. Code Ann. §§ 4933.12, 4933.121 (Supp. 1990). When serving "human needs" consumers including "residential [and] other customers . . . where the element of human welfare [was] the predominant factor," *In re Commission Ordered Investigation of the Availability of Gas Transportation Service Provided by Ohio Gas Distribution Utilities to End-Use Customers*, No. 85–800–GA–COI (Ohio Pub. Util. Comm'n, Aug. 1, 1989), Ohio LDC's were required to provide a firm backup supply of gas, see *ibid.*, and administer specific protective schemes, as by helping to assure a degree of continued service to low-income customers despite unpaid bills. See, e. g., Ohio Admin. Code 4901:1–18 (Ohio Monthly Record Nov. 1991).

## IV

The fact that the local utilities continue to provide a product consisting of gas bundled with the services and protections summarized above, a product thus different from the marketer's unbundled gas, raises a hurdle for GMC's claim

---

sales tax. The record provides no support for this contention, and the constitutionality of Ohio exempting from state sales tax utility sales that are not price regulated is therefore not before the Court in this case.

that Ohio's differential tax treatment of natural gas utilities and independent marketers violates our "'virtually *per se* rule of invalidity,'" *Associated Industries of Mo.* v. *Lohman*, 511 U. S. 641, 647 (1994) (quoting *Philadelphia* v. *New Jersey*, 437 U. S. 617, 624 (1978)), prohibiting facial discrimination against interstate commerce.

## A

Conceptually, of course, any notion of discrimination[12] assumes a comparison of substantially similar entities. Al-

---

[12] Although GMC raises only a "facial discrimination" challenge to Ohio's tax scheme, our cases have indicated that even nondiscriminatory state legislation may be invalid under the dormant Commerce Clause, when, in the words of the so-called *Pike* undue burden test, "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits," *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 142 (1970). There is, however, no clear line between these two strands of analysis, *Brown-Forman Distillers Corp.* v. *New York State Liquor Authority*, 476 U. S. 573, 579 (1986), and several cases that have purported to apply the undue burden test (including *Pike* itself) arguably turned in whole or in part on the discriminatory character of the challenged state regulations, see, *e. g.*, *Pike*, *supra*, at 145 (declaring packing order "virtually *per se* illegal" because it required business operation to be performed in-state); *Kassel* v. *Consolidated Freightways Corp. of Del.*, 450 U. S. 662, 677 (1981) (plurality opinion of Powell, J.) (noting that in adopting invalidated truck-length regulation the State "seems to have hoped to limit the use of its highways by deflecting some through traffic"); *id.*, at 679–687 (Brennan, J., concurring in judgment) (emphasizing that truck-length regulation should be invalidated solely in view of its protectionist purpose); see generally Regan, The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause, 84 Mich. L. Rev. 1091 (1986). Nonetheless, a small number of our cases have invalidated state laws under the dormant Commerce Clause that appear to have been genuinely nondiscriminatory, in the sense that they did not impose disparate treatment on similarly situated in-state and out-of-state interests, where such laws undermined a compelling need for national uniformity in regulation. See *Bibb* v. *Navajo Freight Lines, Inc.*, 359 U. S. 520 (1959) (conflict in state laws governing truck mud flaps); *Southern Pacific Co.* v. *Arizona ex rel. Sullivan*, 325 U. S. 761 (1945) (train lengths); see also *CTS Corp.* v. *Dynamics Corp. of America*, 481 U. S. 69, 88 (1987) ("This Court's recent

though this central assumption has more often than not itself remained dormant in this Court's opinions on state discrimination subject to review under the dormant Commerce Clause, when the allegedly competing entities provide different products, as here, there is a threshold question whether the companies are indeed similarly situated for constitutional purposes. This is so for the simple reason that the difference in products may mean that the different entities serve different markets, and would continue to do so even if the supposedly discriminatory burden were removed. If in fact that should be the case, eliminating the tax or other regulatory differential would not serve the dormant Commerce Clause's fundamental objective of preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors. In Justice Jackson's now-famous words:

> "Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect

Commerce Clause cases also have invalidated statutes that may adversely affect interstate commerce by subjecting activities to inconsistent regulations"); L. Brilmayer, Conflict of Laws § 3.2.3, pp. 144–148 (2d ed. 1995) (discussing Court's review of conflicting state laws under the dormant Commerce Clause). In the realm of taxation, the requirement of apportionment plays a similar role by assuring that interstate activities are not unjustly burdened by multistate taxation. See generally *Oklahoma Tax Comm'n* v. *Jefferson Lines, Inc.*, 514 U. S. 175, 184–185 (1995) (discussing "internal" and "external" consistency tests for apportionment of state taxes). Of course, the fact that Ohio exempts local utilities from its sales and use taxes could not support any claim of undue burden in this nondiscriminatory sense, since the exemption itself does not give rise to conflicting regulation of any transaction or result in malapportionment of any tax.

him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality." *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U. S. 525, 539 (1949).

See also, *e. g., Wyoming v. Oklahoma*, 502 U. S. 437, 469 (1992) (SCALIA, J., dissenting) ("Our negative Commerce Clause jurisprudence grew out of the notion that the Constitution implicitly established a national free market . . ."); *Reeves, Inc. v. Stake*, 447 U. S., at 437 (The dormant Commerce Clause prevents "state taxes and regulatory measures impeding free private trade in the national marketplace"); *Hunt v. Washington State Apple Advertising Comm'n*, 432 U. S. 333, 350 (1977) (referring to "the Commerce Clause's overriding requirement of a national 'common market'"). Thus, in the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply. The dormant Commerce Clause protects markets and participants in markets, not taxpayers as such.

Our cases have, however, rarely discussed the comparability of taxed or regulated entities as operators in arguably distinct markets; the closest approach to the facts here occurred in *Alaska v. Arctic Maid*, 366 U. S. 199 (1961). In *Arctic Maid*, a 4% tax on the value of salmon taken from territorial waters by so-called freezer ships and frozen for transport and later canning outside the State was challenged as discriminatory in the face of a 1% tax on the value of fish taken from territorial waters and frozen by on-shore cold storage facilities for later sale on the domestic fresh-frozen fish market. The State prevailed on the Court's holding that the claimants and cold storage facilities served separate markets, did not compete with one another, and thus could not properly be compared for Commerce Clause purposes. The proper comparison, the Court held, was between the freezer

ships and domestic salmon canners, who shipped interstate into the same markets served by the freezer ships. Since the canners were taxed even more heavily than the freezer ships, there was no unfavorable burden upon the latter. *Id.*, at 204. Although the Court's opinion did not discuss the possibility that competition in the domestic fresh-frozen market might have occurred in the absence of the tax disparity between the two types of salmon freezers, the freezer ships had made no attempt to compete in that market and neither claimed nor demonstrated an interest in entering it. See Brief for Respondents in *Alaska* v. *Arctic Maid*, O. T. 1960, No. 106, pp. 27–33.

*Arctic Maid* provides a partial analogy to this case. Here, natural gas marketers did not serve the Ohio LDCs' core market of small, captive users, typified by residential consumers who want and need the bundled product. See, *e. g.*, Darr, A State Regulatory Strategy for the Transitional Phase of Gas Regulation, 12 Yale J. Reg. 69, 99 (1995) ("[T]he large core residential customer base is bound to the LDC in what currently appears to be a natural-monopoly relationship"); App. 199 (a marketer from which GMC purchased gas does not hold itself out to the general public as a gas supplier, but rather selectively contacts industrial end users that it has identified as potentially profitable customers). While this captive market is not geographically distinguished from the area served by the independent marketers, it is defined economically as comprising consumers who are captive to the need for bundled benefits. These are buyers who live on sufficiently tight budgets to make the stability of rate important, and who cannot readily bear the risk of losing a fuel supply in harsh natural or economic weather. See, *e. g.*, *Consolidated Edison Co. of N. Y.* v. *FERC*, 676 F. 2d 763, 766, n. 5 (CADC 1982) ("[R]esidential users [of natural gas cannot] switch temporarily to other fuels and so they must endure cold homes" if their gas supply is interrupted); Samuels, Reliability of Natural Gas Service for Cap-

tive End-Users Under the Federal Energy Regulatory Commission's Order No. 636, 62 Geo. Wash. L. Rev. 718, 749 (1994) ("Gas service disruptions lasting just a few days can cause severe health risks to captive end-users"). They are also buyers without the high volume requirements needed to make investment in the transaction costs of individual purchases on the open market economically feasible. Pierce, Intrastate Natural Gas Regulation: An Alternative Perspective, 9 Yale J. Reg. 407, 409–410 (1992) ("Purchasing gas service [from marketers] requires considerable time and expertise. Its benefits are likely to exceed its costs only for consumers who purchase very large quantities of gas"). The demands of this market historically arose free of any influence of differential taxation (since there was none during the pre-1978 period when only LDC's generally served end users), and because the market's economic characteristics appear to be independent of any effect attributable to the State's sales taxation as imposed today, there is good reason to assume that any pricing changes that could result from eliminating the sales tax differential challenged here would be inadequate to create competition between LDC's and marketers for the business of the utilities' core home market.

On the other hand, one circumstance of this case is unlike what *Arctic Maid* assumed, for there is a possibility of competition between LDC's and marketers for the noncaptive market. Although the record before this Court reveals virtually nothing about the details of that competitive market, in the period under examination it presumably included bulk buyers like GMC, which have no need for bundled protection, see, *e. g.*, State Issue: Atlanta Gas Light Takes Step to Abandon Gas Sales by Unbundling Services for Non-Core Customers, Foster Natural Gas Report, June 20, 1996, p. 22 (indicating that prior to "unbundling" marketers accounted for 80% of sales to large commercial and industrial users in Georgia), and consumers of middling volumes of natural gas who found

some value in Ohio's state-imposed protections but not enough to offset lower price at some point, see, *e. g.,* Pierobon, Small Customers: The Yellow Brick Road to Deregulation?, 134 Pub. Utils. Fortnightly, No. 6, pp. 14, 15 (1996) (marketers' efforts in California are increasingly directed to attracting consumers in the "small commercial sector," including "schools, hospitals, hotels, restaurants, laundromats, and master-metered apartments," which currently purchase bundled gas from utilities); Salpukas, New Choices for Natural Gas: Retailers Find Users Puzzled as Industry Deregulates, N. Y. Times, Oct. 23, 1996, pp. D1, D4 (indicating that some natural gas marketers in New York City are attempting to lure "mom-and-pop businesses like restaurants and dry-cleaners" away from LDC's, with mixed success). Eliminating the sales tax differential at issue here might well intensify competition between LDC's and marketers for customers in this noncaptive market.

## B

In sum, the LDCs' bundled product reflects the demand of a market neither susceptible to competition by the interstate sellers nor likely to be served except by the regulated natural monopolies that have historically supplied its needs. So far as this market is concerned, competition would not be served by eliminating any tax differential as between sellers, and the dormant Commerce Clause has no job to do. There is, however, a further market where the respective sellers of the bundled and unbundled products apparently do compete and may compete further. Thus, the question raised by this case is whether the opportunities for competition between marketers and LDC's in the noncaptive market requires treating marketers and utilities as alike for dormant Commerce Clause purposes. Should we accord controlling significance to the noncaptive market in which they compete, or to the noncompetitive, captive market in which the local utili-

ties alone operate? Although there is no *a priori* answer, a number of reasons support a decision to give the greater weight to the captive market and the local utilities' singular role in serving it, and hence to treat marketers and LDC's as dissimilar for present purposes. First and most important, we must recognize an obligation to proceed cautiously lest we imperil the delivery by regulated LDC's of bundled gas to the noncompetitive captive market. Second, as a Court we lack the expertness and the institutional resources necessary to predict the effects of judicial intervention invalidating Ohio's tax scheme on the utilities' capacity to serve this captive market. Finally, should intervention by the National Government be necessary, Congress has both the resources and the power to strike the balance between the needs of the competitive and captive markets.

1

Where a choice is possible, as it is here, the importance of traditional regulated service to the captive market makes a powerful case against any judicial treatment that might jeopardize LDCs' continuing capacity to serve the captive market. Largely as a response to the monopolistic shakeout that brought an end to the era of unbridled competition among gas utilities, regulation of natural gas for the principal benefit of householders and other consumers of relatively small quantities is the rule in every State in the Union. Congress has also long recognized the desirability of these state regulatory regimes. *Supra*, at 291–293. Indeed, half a century ago we concluded that the NGA altogether exempts state regulation of retail sales of natural gas (including in-state sales to large industrial customers) from the strictures of the dormant Commerce Clause, see *Panhandle Eastern Pipe Line Co.* v. *Public Serv. Comm'n of Ind.*, 332 U. S. 507 (1947), and to this day, notwithstanding the national regulatory revolution, Congress has done nothing to limit its unbroken recognition of the state regulatory authority that

has created and preserved the local monopolies.[13]  The clear implication is that Congress finds the benefits of the bundled product for captive local buyers well within the realm of what the States may reasonably promote and preserve.

This Court has also recognized the importance of avoiding any jeopardy to service of the state-regulated captive market, and in circumstances remarkably similar to those of the present case.   In *Panhandle Eastern Pipe Line Co.* v. *Michigan Pub. Serv. Comm'n*, 341 U. S. 329 (1951), Ford Motor Company had entered a contract with an interstate pipeline for supply of gas at Ford's plant in Dearborn, Michigan, thus bypassing the local distribution company.   The Michigan Public Service Commission ordered the pipeline to cease and desist from making direct sales of natural gas to the State's industrial customers without a certificate of public convenience and necessity, and the pipeline brought a Commerce Clause challenge to the commission's action.   The Court observed that

> "[a]ppellant asserts a right to compete for the cream of the volume business without regard to the local public convenience or necessity.   Were appellant successful in this venture, it would no doubt be reflected adversely in [the LDC's] over-all costs of service and its rates to customers whose only source of supply is [the LDC]. This clearly presents a situation of . . . vital interest to the State of Michigan."   *Id.*, at 334.

In view of the economic threat that competition for large industrial consumers posed to gas service to small captive

---

[13] In the present case, the parties have not briefed the question whether the present amended version of the NGA and related federal legislation continues the express Commerce Clause exemption for state regulation and taxation of retail natural gas sales recognized in *Panhandle-Indiana,* and we do not decide this issue.   We note, however, that the language of § 1(b) of the NGA, which the *Panhandle-Indiana* Court construed as creating the exemption, itself remains unchanged.   (Compare 52 Stat. 821 with 15 U. S. C. § 717(b) (1994).)

users, the Court again reaffirmed its longstanding doctrine upholding the States' power to regulate all direct in-state sales to consumers, even if such regulation resulted in an outright prohibition of competition for even the largest end users. *Id.*, at 336–337; see also *Panhandle-Indiana, supra* (upholding state regulation of direct sales to large industrial users as not pre-empted by the NGA or precluded by the dormant Commerce Clause).[14]

The continuing importance of the States' interest in protecting the captive market from the effects of competition for the largest consumers is underscored by the common sense of our traditional recognition of the need to accommodate state health and safety regulation in applying dormant Commerce Clause principles. State regulation of natural gas sales to consumers serves important interests in health and safety in fairly obvious ways, in that requirements of dependable supply and extended credit assure that individual buyers of gas for domestic purposes are not frozen out of their houses in the cold months. We have consistently recognized the legitimate state pursuit of such interests as compatible with the Commerce Clause, which was "'never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country.'" *Huron Portland Cement Co. v. Detroit,* 362 U. S.

---

[14] Under today's altered market structure, see *supra,* at 283–285, several Courts of Appeals have held that the NGA confers jurisdiction on FERC, rather than the States, to regulate such bypass arrangements for supplying gas to large industrial consumers when the sale of gas itself occurs outside the State and an interstate pipeline merely transports the gas to the industrial consumer for delivery in-state. See *Cascade Natural Gas Corp. v. FERC,* 955 F. 2d 1412, 1414–1422 (CA10 1992); *Michigan Consolidated Gas Co. v. Panhandle Eastern Pipe Line Co.,* 887 F. 2d 1295, 1299–1301 (CA6 1989), cert. denied, 494 U. S. 1079 (1990); *Michigan Consolidated Gas Co. v. FERC,* 883 F. 2d 117, 121–122 (CADC 1989), cert. denied, 494 U. S. 1079 (1990). We express no view on the correctness of these decisions.

440, 443–444 (1960) (quoting *Sherlock* v. *Alling*, 93 U. S. 99, 103 (1876)). Just so may health and safety considerations be weighed in the process of deciding the threshold question whether the conditions entailing application of the dormant Commerce Clause are present.[15]

2

The size of the captive market, its noncompetitive character, the values served by its traditional regulation: all counsel caution before making a choice that could strain the capacity of the States to continue to demand the regulatory benefits that have served the home market of low-volume users since natural gas became readily available. Here we have to assume that any decision to treat the LDC's as similar to the interstate marketers would change the LDCs' position in the noncaptive market in which (we are assuming) they compete, at least at the margins, by affecting the overall size of the LDCs' customer base. As we recognized in *Panhandle*, a change in the customer base could affect the LDCs' ability to continue to serve the captive market where there is no such competition.

To be sure, what in fact would happen as a result of treating the marketers and LDC's alike we do not know. We might assume that eliminating the tax on marketers' sales would leave those sellers stronger competitors in the noncaptive market, especially at the market's boundaries, and that any resulting contraction of the LDCs' total customer base would increase the unit cost of the bundled product. We might also suppose that the State would not respond to our decision by subjecting the LDC's and marketers both to the

[15] Of course, if a State discriminates against out-of-state interests by drawing geographical distinctions between entities that are otherwise similarly situated, such facial discrimination will be subject to a high level of judicial scrutiny even if it is directed toward a legitimate health and safety goal. See, *e. g., Philadelphia* v. *New Jersey*, 437 U. S. 617, 626–628 (1978); *Dean Milk Co.* v. *Madison*, 340 U. S. 349, 353–354 (1951).

same sales tax now imposed on marketers alone, since the
utilities are already subject to a complicated scheme of prop-
erty taxation quite different from the tax treatment of the
marketers.[16]   It seems, in fact, far more likely that eliminat-
ing the tax challenged here would portend, among other
things, some reduction of the total taxes levied against
LDC's, in order to strengthen their position in trying to
compete with marketers in the noncaptive market.

The degree to which these very general suggestions might
prove right or wrong, however, is not really significant; the
point is simply that all of them are nothing more than sug-
gestions, pointedly couched in terms of assumption or suppo-
sition.   This is necessarily so, simply because the Court is
institutionally unsuited to gather the facts upon which eco-
nomic predictions can be made, and professionally untrained
to make them.   See, *e. g., Fulton Corp.* v. *Faulkner,* 516
U. S., at 341–342, and authorities cited therein; Hunter, Fed-
eralism and State Taxation of Multistate Enterprises, 32
Emory L. J. 89, 108 (1983) ("It is virtually impossible for a
court, with its limited resources, to determine with any de-
gree of accuracy the costs to a town, county, or state of a
particular industry"); see also Smith, State Discriminations
Against Interstate Commerce, 74 Calif. L. Rev. 1203, 1211
(1986) (noting that "[e]ven expert economists" may have dif-
ficulty determining "whether the overall economic benefits

---

[16] For example, public utilities pay personal property tax on 88% of true
value, Ohio Rev. Code Ann. § 5727.111 (1996), while marketers pay per-
sonal property tax on 25% of their true value, § 5711.22(D).   Public utili-
ties also pay a special tax assessment for the expenses of the Public Utility
Commission, § 4905.10 (1991), and for the expenses of the Ohio Consumer
Counsel, § 4911.18.   Moreover, natural gas utilities must pay a gross re-
ceipts tax of 4.75% on gas sales, § 5727.38 (1996), while marketers pay
none.   Independent marketers, for their part, are subject to a franchise
tax, § 5733.01, that does not apply to utilities, § 5733.09(a).   Thus, this sales
and use tax challenge would not be the last available to marketers and
their customers; the franchise tax, which also does not apply to utilities,
is presumably next in line.

and burdens of a regulation favor local inhabitants against outsiders"). We are consequently ill qualified to develop Commerce Clause doctrine dependent on any such predictive judgments, and it behooves us to be as reticent about projecting the effect of applying the Commerce Clause here, as we customarily are in declining to engage in elaborate analysis of real-world economic effects, *Fulton Corp.*, *supra*, at 341–342, or to consider subtle compensatory tax defenses, *Oregon Waste Systems, Inc.* v. *Department of Environmental Quality of Ore.*, 511 U. S. 93, 105 (1994). The most we can say is that modification of Ohio's tax scheme could subject LDC's to economic pressure that in turn could threaten the preservation of an adequate customer base to support continued provision of bundled services to the captive market. The conclusion counsels against taking the step of treating the bundled gas seller like any other, with the consequent necessity of uniform taxation of all gas sales.

3

Prudence thus counsels against running the risk of weakening or destroying a regulatory scheme of public service and protection recognized by Congress despite its noncompetitive, monopolistic character. Still less is that risk justifiable in light of Congress's own power and institutional competence to decide upon and effectuate any desirable changes in the scheme that has evolved. Congress has the capacity to investigate and analyze facts beyond anything the Judiciary could match, joined with the authority of the commerce power to run economic risks that the Judiciary should confront only when the constitutional or statutory mandate for judicial choice is clear. See, *e. g., Bush* v. *Lucas*, 462 U. S. 367, 389 (1983) (Congress "may inform itself through factfinding procedures such as hearings that are not available to the courts"). One need not adopt Justice Black's extreme reticence in Commerce Clause jurisprudence to recognize in this instance the soundness of his statement that a challenge

like the one before us "call[s] for Congressional investigation, consideration, and action. The Constitution gives that branch of government the power to regulate commerce among the states, and until it acts I think we should enter the field with extreme caution." *Northwest Airlines, Inc.* v. *Minnesota,* 322 U. S. 292, 302 (1944) (concurring opinion). This conclusion applies *a fortiori* here, because for a half century Congress has been aware of our conclusion in *Panhandle Eastern Pipe Line Co.* v. *Public Serv. Comm'n of Ind.,* 332 U. S. 507 (1947), that the NGA exempts state regulation of in-state retail natural gas sales from the dormant Commerce Clause and in the years following that decision has only reaffirmed the power of the States in this regard.

\* \* \*

Accordingly, we conclude that Ohio's regulatory response to the needs of the local natural gas market has resulted in a noncompetitive bundled gas product that distinguishes its regulated sellers from independent marketers to the point that the enterprises should not be considered "similarly situated" for purposes of a claim of facial discrimination under the Commerce Clause. GMC's argument that the State discriminates between regulated local gas utilities and unregulated marketers must therefore fail.

## C

GMC also suggests that Ohio's tax regime "facially discriminates" because the State's sales and use tax exemption would not apply to sales by out-of-state LDC's. See, *e. g.,* Reply Brief for Petitioner 2, n. 1. As respondent points out, however, the Ohio courts might well extend the challenged exemption to out-of-state utilities if confronted with the question. Indeed, in *Carnegie Natural Gas Co.* v. *Tracy,* No. 94–K–526 (Ohio Bd. Tax App., Nov. 17, 1995), reported in CCH Ohio Tax Rep. ¶ 402–254, the Ohio Board of Tax Appeals accepted the argument of a Pennsylvania public util-

ity that insofar as the out-of-state utility sold natural gas to Ohio consumers it qualified as a utility under Ohio Rev. Code Ann. § 5727.01 and was therefore exempt from the State's corporate franchise tax. Out-of-state public utilities may therefore also qualify for Ohio's sales and use tax exemption. Because "we have never deemed a hypothetical possibility of favoritism to constitute discrimination that transgresses constitutional commands," *Associated Industries of Mo.* v. *Lohman*, 511 U. S., at 654, this argument, too, must be rejected.

## V

Finally, GMC claims that Ohio's tax regime violates the Equal Protection Clause by treating LDCs' natural gas sales differently from those of producers and marketers. Once again, the hurdle facing GMC is a high one, since state tax classifications require only a rational basis to satisfy the Equal Protection Clause. See, *e. g., Amerada Hess Corp.* v. *Director, Div. of Taxation, N. J. Dept. of Treasury,* 490 U. S., at 80. Indeed, "in taxation, even more than in other fields, legislatures possess the greatest freedom in classification." *Madden* v. *Kentucky,* 309 U. S. 83, 88 (1940).

It is true, of course, that in some peculiar circumstances state tax classifications facially discriminating against interstate commerce may violate the Equal Protection Clause even when they pass muster under the Commerce Clause. See *Metropolitan Life Ins. Co.* v. *Ward,* 470 U. S. 869, 874–883 (1985).[17] But as we explain in Part IV, *supra,* Ohio's

---

[17] *Ward* involved an Alabama statute that facially discriminated against interstate commerce by imposing a lower gross premiums tax on in-state than out-of-state insurance companies. The case did not present a Commerce Clause violation only because Congress, in enacting the McCarran-Ferguson Act, 15 U. S. C. §§ 1011–1015, intended to authorize States to impose taxes that burden interstate commerce in the insurance field. *Ward,* 470 U. S., at 880. We nonetheless invalidated Alabama's classification because "neither of the two purposes furthered by the [statute] . . . is legitimate under the Equal Protection Clause . . . ." *Id.,* at 883.

differential tax treatment of LDC and independent marketer sales does not facially discriminate against interstate commerce.   And in any event, there is unquestionably a rational basis for Ohio's distinction between these two kinds of entities.

*   *   *

We conclude that Ohio's differential tax treatment of public utilities and independent marketers violates neither the Commerce Clause nor the Equal Protection Clause and that petitioner's claims are without merit otherwise.   The judgment of the Supreme Court of Ohio is affirmed.

*It is so ordered.*

JUSTICE SCALIA, concurring.

I join the Court's opinion, which thoroughly explains why the Ohio tax scheme at issue in this case does not facially discriminate against interstate commerce.   I write separately to note my continuing adherence to the view that the so-called "negative" Commerce Clause is an unjustified judicial invention, not to be expanded beyond its existing domain.   "The historical record provides no grounds for reading the Commerce Clause to be other than what it says—an authorization for Congress to regulate Commerce." *Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue,* 483 U. S. 232, 263 (1987) (SCALIA, J., concurring in part and dissenting in part).

I have previously stated that I will enforce on *stare decisis* grounds a "negative" self-executing Commerce Clause in two situations: (1) against a state law that facially discriminates against interstate commerce, and (2) against a state law that is indistinguishable from a type of law previously held unconstitutional by this Court. *West Lynn Creamery, Inc.* v. *Healy,* 512 U. S. 186, 210 (1994) (opinion concurring in judgment); *Itel Containers Int'l Corp.* v. *Huddleston,* 507 U. S. 60, 78 (1993) (opinion concurring in part and concurring in

judgment) (collecting cases). Although petitioner contends that Ohio facially discriminates against interstate commerce with respect to natural gas sales, its argument is based on a novel premise: that private marketers engaged in the sale of natural gas are similarly situated to public utility companies. Nothing in this Court's negative Commerce Clause jurisprudence compels that conclusion. To hold that States must tax gas sales by these two types of entities equally would broaden the negative Commerce Clause beyond its existing scope, and intrude on a regulatory sphere traditionally occupied by Congress and the States.

JUSTICE STEVENS, dissenting.

In Ohio, as in other States, regulated utilities selling natural gas—referred to by the Court as "LDC's"—operate in two markets, one that is monopolistic and one that is competitive.

In the first, they sell a "noncompetitive bundled gas product," *ante*, at 310, to small consumers who have no practical alternative source of supply. The LDCs' dominant position in that market justifies detailed regulation of their activities in order to protect consumers from the risk of exploitation by a seller with monopoly power. See *ante*, at 294–297. The basic purpose of that regulation is to protect consumers, not to subsidize the LDC's.

The second market in which LDC's sell natural gas is a competitive market in which large customers like the General Motors Corporation (GMC) have alternative sources of supply. Although Ohio possesses undoubted power to regulate the activities of all sellers in that market, *Panhandle Eastern Pipe Line Co.* v. *Michigan Pub. Serv. Comm'n*, 341 U. S. 329 (1951), it has not done so in any manner relevant here. The purchasers in this competitive market do not need the protections afforded by the state regulation of the monopolistic market, see *ante*, at 302–303, and the benefits provided by these regulations will thus not affect a competi-

tive consumer's choice of seller. Customers like GMC are not "captive to the need for bundled benefits," *ante*, at 301. Nor do the burdens imposed by the regulations have a significant impact on LDCs' activities within this market. Thus, while the gas sold by LDC's on the competitive market may be subject to the same regulations as the gas sold in the noncompetitive market, the different impact of the regulations on the economic decisions of both consumers and sellers makes it appropriate to characterize all gas sold in that market as "unbundled gas," see *ante*, at 297. Although the physical composition of the gas sold in the two markets is identical, I agree with what I understand the Court to be assuming, namely, that as a matter of economics "bundled gas" and "unbundled gas" should be viewed as different products. See *ante*, at 299, 301–303.

It is not uncommon for a firm with a monopolistic position in one market also to sell a second product in a competitive market. See, *e. g.*, *International Business Machines Corp.* v. *United States*, 298 U. S. 131 (1936). Even regulated monopolies such as electric utilities may distribute goods, such as light bulbs, in a competitive market. See, *e. g.*, *Cantor* v. *Detroit Edison Co.*, 428 U. S. 579 (1976). There is no reason why an LDC might not develop a product line, such as thermostats or gas furnaces, to sell in the competitive market for such products. I do not believe that the fact that the LDC is heavily regulated in the "bundled gas" market would justify granting it a special preference in the market for thermostats or gas furnaces. Nor do I discern a significant relevant difference between competition in "unbundled gas" and competition in thermostats or gas furnaces.

It may well be true that without a discriminatory tax advantage in the competitive market, the LDC's would lose business to interstate competitors and therefore be forced to increase the rates charged to small local consumers. This circumstance may require the States to find new, and nondiscriminatory, methods for accommodating the needs of small

consumers for regular and reasonably priced natural gas service. As the Court recognizes, speculation about the "real-world economic effects" of a decision like this one is beyond our institutional competence. See *ante*, at 309. Such speculation is not, therefore, a sufficient justification for a tax exemption that discriminates against interstate commerce. *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984).

Accordingly, while I agree with Parts II and IV of the Court's opinion, I respectfully dissent from the judgment.