CROPLIFE AMERICA, INC.; Rise; Berry Hill Farms, Inc., d/b/a America's Best Flowers Garden Center; Wisconsin Fertilizer & Chemical Association; Landmark Services Cooperative; Midwest Hardware Association; Keyman Lawn Care, LLC; Midwest Lawn Care, LLC; and Wisconsin Landscape Federation, Plaintiffs,

v.

CITY OF MADISON, Kathryn N. Vedder, Michael May, Dane County, Kathleen Falk and Lynn Green, Defendants.

No. 04–C–0949–C.

United States District Court,
W.D. Wisconsin.

June 13, 2005.

As amended June 15, 2005.

Ann Ustad Smith, Michael Best & Friedrich, LLP, Madison, WI, Lawrence

S. Ebner, McKenna Long & Aldridge LLP, Washington, DC, for Plaintiffs, America's Best Flowers Garden Center, Berry Hill Farms, Inc., Croplife America, Inc., Keyman Lawn Care, LLC, Landmark Services Cooperative, Midwest Hardware Association, Midwest Lawn Care, LLC, Rise, Wisconsin Fertilizer & Chemical Association, Wisconsin Landscape Federation.

Michael P. May, City Attorney, Madison, WI, for Defendants, City of Madison, Michael May, Kathryn N. Vedder.

Marcia A. MacKenzie, Dane County Corporation Counsel, Madison, WI, for Defendants, Dane County, Kathleen Falk, Lynn Green.

## OPINION AND ORDER

CRABB, District Judge.

This civil action for injunctive relief raises the question whether local governmental units can impose restrictions on fertilizer content, use and sale without violating the supremacy or commerce clauses of the United States Constitution or the rights of plaintiff fertilizer sellers under the First and Fourteenth Amendments to the United States Constitution and comparable provisions of Wisconsin's constitution. Plaintiffs are suing to enjoin the City of Madison and Dane County from enforcing certain ordinances enacted in 2004 regulating the use, display and sale of lawn fertilizers containing trace amounts of phosphorus.

Plaintiffs assert jurisdiction under 28 U.S.C. § 1331, because the case raises federal questions, and under 28 U.S.C. § 1367, because the case raises a state preemption question so related to claims in the action within the court's original jurisdiction that it forms part of the same case or controversy. The case is before the court on cross-motions for summary judgment. I conclude that the ordinances are not preempted. Neither the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. §§ 136–136y, nor Wis. Stats. Ch. 94 and implementing regulations issued by the Wisconsin Department of Agriculture, Trade and Consumer Protection, preempt the field of fertilizer regulation either explicitly or implicitly; compliance with the ordinances and with federal and state law is not a physical impossibility; and the ordinance does not conflict with the objectives of the state or federal legislatures. State and federal regulation of pesticides does not preempt local regulation of fertilizers even when the fertilizers are mixed with the regulated pesticides so long as the local regulation applies only to the fertilizer portion of the mixed product.

The ordinances do not violate the commerce clauses of the federal and state constitutions. At most they impose an incidental burden on interstate commerce that is justified by the purpose of the regulations, which is to maintain and improve the water quality of the area's lakes and rivers. The county ordinance does not have either a protectionist purpose or effect; plaintiffs have not shown either that biosolids are a substitute for commercial fertilizers or that the county's differential treatment of biosolids and commercial fertilizers promotes in-state suppliers of either product at the expense of out-of-state suppliers. The county ordinance does not violate the equal protection clauses of the state and federal constitutions because biosolids and commercial fertilizers are not similarly situated for equal protection purposes and even if they were, the ordinance has the rational purpose of protecting water quality. It is irrelevant that the means the county has chosen to achieve this purpose may not be the most efficacious or complete. Governments are permitted to legislate in small increments and in the manner they choose so long as a court can conceive of some basis on which the legislation may be considered rational. The

city ordinance does not violate the due process clauses of either constitution because it is not so vague that persons of ordinary intelligence cannot understand it and it contains standards specific enough to prevent arbitrary enforcement. Finally, neither ordinance violates anyone's freedom of speech because it does not ban any commercial speech that concerns a lawful activity and is not misleading.

From the facts proposed by the parties, I find that the following are undisputed and material.

## UNDISPUTED FACTS

Plaintiffs Croplife America, Inc., RISE, Berry Hill Farms, Inc., America's Best Flowers Garden Center, Wisconsin Fertilizer & Chemical Association, Landmark Services Cooperative, Midwest Hardware Association, Keyman Lawn Care, LLC, Midwest Lawn Care, LLC and Wisconsin Landscape Federation are entities involved in the fertilizer industry. They or their members offer fertilizer products for sale.

Defendant City of Madison adopted the amendments at issue in this case in February 2004. Defendant Kathryn Vedder is Director of Public Health for the City of Madison and defendant Michael May is the city's attorney. Defendant Dane County adopted the amendments in April 2004. Defendant Kathleen Falk is Dane County Executive and defendant Lynn Green is Director of the Dane County Department of Human Services. All of the individual defendants are charged with enforcement of the amendments, which I will refer to in this opinion as ordinances.

In the spring of 2003, defendant Kathleen Falk asked the Dane County Lakes and Watershed Commission to develop an ordinance restricting the use of lawn fertilizers containing phosphorous within the county. The commission drafted an ordinance and held a public hearing on it on December 11, 2003. Representatives of plaintiffs testified at the hearing and offered written responses to questions posed by the commission. On April 15, 2004, the Dane County Board of Supervisors adopted Ordinance Amendment No. 33, 2003–2004, creating Chapter 80 of the Dane County Code of Ordinances, entitled "Establishing Regulations for Lawn Fertilizer Application and Sale." Defendant Falk approved the ordinance on April 20, 2004.

On June 2, 2004, plaintiffs served notices of claim on the Dane County Clerk, on the City of Madison Clerk and defendants Falk, Green, Vedder and May. Both claims were disallowed as of October 2, 2004. Plaintiffs filed this suit on December 15, 2004.

Phosphorus is present in all living cells and is essential to all forms of life. To claim phosphorus on a label, manufacturers must provide a minimum guarantee of available plant nutrient expressed in terms of available phosphate or phosphorus. Typical lawn fertilizers have three numbers displayed prominently, denoting in order the amount of nitrogen, the available phosphate and the amount of soluble potash. Both organic and inorganic fertilizers can contain phosphate. In general, organic fertilizers tend to contain less nitrogen than inorganic fertilizers.

Most manufacturers of inorganic fertilizers are located outside Wisconsin and do not manufacture organic fertilizers. The county's ordinance exempts biosolids from the phosphorus ban. Biosolids are byproducts of treated municipal sewerage waste that do not contain pesticides. They are not formulated to provide the concentrated quantity of nutrients provided by commercial fertilizers. The Milwaukee Metropolitan Sewerage District sells an organic fertilizer marketed as Milorganite®, which is a biosolid (sewage sludge) containing phosphorus and advertised as

"America's leading organic nitrogen fertilizer." It is a slow release nitrogen, heat-dried palletized fertilizer. The district promotes Milorganite® as a turf grass fertilizer. *See, e.g., www.milorganite.com.* It is a specialized product that controls its own niche market. The district asked for and received an exemption from Dane County's ordinance for biosolids that covers Milorganite®. The Madison Metropolitan Sewerage District is considering the introduction of its own organic granular biosolid fertilizer in the future.

Fertilizer manufacturers have developed zero-phosphorus fertilizer formulations and shipped them within Dane County.

Excess phosphorus is a major contributor to the algae blooms in Madison area lakes. Urban sources include soil erosion, airborne material such as dust and pollen and organic material such as decaying leaves and animal waste. The city and county could reduce phosphorus in the lakes and waterways by dredging the lakes, hiring more street cleaners and reducing the goose and duck population.

## OPINION

### A. *The Ordinances*

The county's ordinance applies to the entire county, although cities or villages within the county may regulate lawn fertilizer application and sale if they adopt ordinances at least as restrictive as the county's. County Ordinance, § 80.03. Both the city's and the county's ordinances prohibit the sale, display or application of any lawn fertilizer that contains phosphorus. City Ordinance § 7.48(3); County Ordinance § 80.05. (Neither prohibits the sale, display or application of fertilizers containing phosphorus for agricultural uses, vegetable and flower gardens or application to trees and shrubs.) Both ordinances make it explicit that they apply to lawn and turf fertilizers only. The county's ordinance exempts "[y]ard waste compost, biosolids

or other similar materials that are primarily organic in nature and are applied to improve the physical condition of the soil." County Ordinance § 80.06(4). Both ordinances prohibit the application of lawn fertilizer when the ground is frozen; the city's ordinance adds a prohibition against applying fertilizer "when conditions exist which promote or create runoff." Persons who violate the ordinances face forfeitures of between $25 to $300 for each offense. (Both ordinances are reproduced in full at the end of this opinion.)

### B. *Preemption*

#### 1. *State law preemption*

For their preemption argument, plaintiffs place primary emphasis on their contention that state laws regulating pesticides preempt the city and county ordinances, insofar as those ordinances attempt to regulate fertilizer products that are combined with pesticides. Therefore, I will begin with that contention, anomalous as it may seem to begin a federal question lawsuit with a discussion of a state law question.

Wis. Stat. § 94.64(1)(e) defines pesticides as including fertilizers that are combined with an herbicide, insecticide or any kind of pesticide. Wis. Stat. § 94.701 forbids the state's political subdivisions from prohibiting the use of pesticides or otherwise regulating their use. Relying on these statutes and the purpose behind them, which was to enact uniform pesticide rules on a matter of statewide concern, plaintiffs argue that defendants lack the authority to enact ordinances that attempt to regulate the sale or use of any fertilizer that contains a pesticide (referred to as "mixed fertilizers" in the ordinances).

Plaintiffs are attacking a straw man of their own construction. Nothing in the challenged ordinances says anything about pesticide composition, use or sale. The

ordinances are directed only to the composition, use and sale of the fertilizers with which the pesticides are mixed. The city and county do not allow lawn fertilizers that contain phosphorus, but neither government has attempted to restrict the nature or composition of the pesticides with which a fertilizer product is combined. So long as those pesticides meet state law requirements, manufacturers can mix them with phosphorus-free fertilizer and meet the city's and county's restrictions.

It is irrelevant to the legality of the ordinances that the state refers to these mixed fertilizer-pesticide products as "pesticides" for the purpose of its regulations. It does so to insure that manufacturers do not try to evade any of the pesticide regulations by mixing their pesticides with fertilizers, not because it is regulating the fertilizer portion of the mixture. The city and county would be barred from enacting regulations on fertilizer use and sale if the legislature had expressly withdrawn defendants' power to regulate fertilizer use or sales or if the challenged ordinances conflicted logically with any state legislation, defeated its purpose or went against its spirit. *Anchor Savings & Loan Assn. v. Madison EOC,* 120 Wis.2d 391, 397, 355 N.W.2d 234, 238 (1984) (listing instances in which court would find legislatively intended withdrawal of power from municipality that would necessarily nullify local ordinance). Plaintiffs have identified no action by the legislature to take away the authority of local units of government to regulate fertilizer use or shown any logical conflict between the local ordinances and any state legislation.

### 2. *Federal preemption*

■■■ The supremacy clause of the United States Constitution makes the Constitution, federal laws and treaties, the "supreme Law of the Land." U.S. Const., Art. VI, cl. 2. State laws that " 'interfere with, or are contrary to the laws of congress' "

are invalid. *Wisconsin Public Intervenor v. Mortier,* 501 U.S. 597, 604, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991) (quoting *Gibbons v. Ogden,* 22 U.S. 1, 9 Wheat. 1, 211, 6 L.Ed. 23 (1824)). Federal laws may preempt state laws in several ways: if Congress makes it explicit in the statute that it intends to supplant state authority in a given area; if the statutory scheme in a given area is so pervasive as to make it reasonable to infer that Congress has left no room for the states to supplement federal law in that area; if the laws actually conflict, making it impossible to comply with both state and federal laws; or if a state law stands as an obstacle to achievement of Congress's full purposes and objectives. *Mortier,* 501 U.S. at 604–05, 111 S.Ct. 2476.

■■■ Plaintiffs' preemption argument rests on the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136–136y, which is a comprehensive regulatory statute governing the registration, labeling, sale and use of pesticides. *Mortier,* 501 U.S. at 601, 111 S.Ct. 2476. The law authorizes the Administrator of the Environmental Protection Agency to enter into cooperative agreements with the states to enforce its provisions. The law does not supersede local regulation of pesticide use, but leaves to the states decisions about the allocation of regulatory responsibility within each state. *Id.* at 608, 111 S.Ct. 2476. However, the law prohibits the states from imposing or continuing in effect "any requirements for labeling or packaging in addition to or different from those required under [FIFRA]." *Id.* at 613, 111 S.Ct. 2476; 7 U.S.C. § 136v(b).

Under FIFRA, each pesticide product must be registered with the EPA and bear EPA-approved product labeling that is nationally uniform. 7 U.S.C. §§ 136a(a) & (c)(5); 40 C.F.R. § 152.130(a). Before the

EPA grants a registration, it insures that a product's label contains warnings, precautionary statements and directions for use that are "necessary for effecting" the product's purpose and "adequate to protect health and the environment." 7 U.S.C. §§ 136(q)(1)(F) and (G); 40 C.F.R. Part 156. Included in the directions for use requirement is a provision that the label "shall include ... The frequency and timing of applications necessary to obtain effective results without causing unreasonable adverse effects on the environment [and][a]ny limitations or restrictions on use required to prevent unreasonable adverse effects." 40 C.F.R. § 156.10(i)(2)(vii) & (ix).

■ When defendant City of Madison adopted its no-phosphorus fertilizer ordinance, it included certain exceptions to the prohibition on the use and purchase of such fertilizer, such as when a property owner is first establishing turf. It added the requirement that persons applying fertilizer containing phosphorus pursuant to any of the exceptions were required to "water such lawn and turf fertilizer into the soil where it is immobilized and generally protected from loss by runoff." § 7.48(7)(b). After this lawsuit began, the city council amended § (7)(b) to read: "Any person who applies a lawn and turf fertilizer containing phosphorus pursuant to the aforementioned exceptions shall, consistent with the product label instructions, water such lawn and turf fertilizer into the soil where it is immobilized and generally protected from loss by runoff."

In arguing that this requirement conflicts expressly with FIFRA because it adds a new or different requirement to water lawns *immediately* following application of a fertilizer-pesticide product, plaintiffs misread the ordinance. Neither in its original form nor in its amended form does § 7.48(b) say anything about immediate watering; the amendment makes it clear that the city's regulations do not override the instructions on the product label. The ordinance specifies that the person applying the product is to water the fertilizer only when doing so is consistent with the product's label instructions. This allegedly "new" or "different" requirement has nothing to do with the use or application of a pesticide; it is aimed at the fertilizer component of the combined product. The person applying the product follows the instructions on the label relating to the use and application of the pesticide; then, when doing so is consistent with the instructions relating to the pesticide, she waters the lawn to insure that the fertilizer components do not escape from the lawn.

Plaintiffs argue that the city ordinance is preempted because it is in implicit conflict with FIFRA. This is true only when the ordinance is read to include a requirement of immediate watering that is not present. It is not physically impossible to comply with both the label requirements imposed by the EPA pursuant to FIFRA and the city's watering requirements. The person applying the product simply waters as soon as doing so is consistent with the product's instructions.

Plaintiffs have not shown any basis for finding federal or state preemption of the challenged lawn fertilizer regulations. Therefore, it is unnecessary to consider defendants' default position, which is that the state's specific delegation of authority to the Dane County Lakes and Watershed Commission to act to improve and maintain water quality in Dane County lakes allows the fertilizer regulation even if there is a conflict between the commission's recommendations and state laws because the delegation is a specific provision that overrides the more general one of fertilizer regulation.

## C. *Commerce Clause*

The United States Constitution reserves to the federal government and to Congress in particular the power to regulate commerce among the states. U.S. Const. art. I, § 8, cl. 3. Although the clause speaks explicitly only of the extensive powers given to Congress, it has been interpreted as having a second purpose of preventing individual states from erecting trade barriers and discriminating against out-of-state products and manufacturers or otherwise burdening the flow of interstate commerce. *General Motors Corp. v. Tracy,* 519 U.S. 278, 287, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997) ("The negative or dormant implication of the Commerce Clause prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby 'imped[es] free private trade in the national market place.' ") (internal citations omitted). *See also Granholm v. Heald,* —— U.S. ——, 125 S.Ct. 1885, 1895, 161 L.Ed.2d 796 (2005) ("Time and time again this Court has held that, in all but the narrowest circumstances, state laws violate the Commerce Clause if they mandate 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.' ") (quoting *Oregon Waste Systems, Inc. v. Dept. of Environmental Quality of Oregon.,* 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994)).

■■■ State and local laws affecting commerce fall into three categories. *National Paint & Coatings v. City of Chicago,* 45 F.3d 1124, 1131 (7th Cir.1995). The first includes laws that discriminate explicitly against interstate commerce, such as a law forbidding the sale of fertilizers produced outside the state or, as in *Granholm,* 125 S.Ct. 1885, forbidding out-of-state wineries to ship directly to in-state consumers while permitting in-state wineries to ship directly to in-state consumers. The second category includes laws that

appear to be neutral on their face but bear more heavily on interstate commerce than on local commerce, such as a law requiring all fertilizer sold in the state to be packaged there. The third category includes "laws that affect commerce without any reallocation among jurisdictions—that do not give local firms any competitive advantage over those located elsewhere." *Id.* Laws that fall into the first category are essentially per se violations of the commerce clause; laws in the second category can be saved if the discriminatory impact is weak and the "state can establish that reasonable persons who hold all states' interests in equal regard could think that net benefits remained." *Id.* In the third category, a law or ordinance will survive if it has a rational basis. *Id.*

### 1. *The city ordinance*

■■■ The city ordinance's ban on phosphate in commercial fertilizers does not fit into the first *National Paint* category. The ordinance has no protectionist purpose. It does not discriminate explicitly against interstate sellers but applies to both local and out-of-state firms that manufacture commercial fertilizers.

The ban does not fit into the second, disparate impact category because it does not impose a burden that falls more heavily on interstate commerce than on local commerce. Plaintiffs have made no showing that out-of-state manufacturers of commercial fertilizers would be any more inconvenienced than in-state manufacturers if they had to manufacture phosphorus-free fertilizers for sale in the City of Madison or that Wisconsin manufacturers of commercial fertilizers would gain any commercial advantage in sales over their out-of-state counterparts because of the ban.

Plaintiffs do not suggest that this is a situation in which the Wisconsin manufacturers have already converted to phospho-

rus-free fertilizers so as to take competitive advantage of the ban or that in-state manufacturers stand in a position to gain from the ban in some particular way. Even if plaintiffs had made such a showing, the net benefits to the county's water resources would remain after taking into consideration the minor additional inconvenience and expense the out-of-state manufacturers would incur. In this respect, the case is much like *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981), in which the regulation at issue was one banning the sale of milk in disposable plastic containers for environmental reasons. Although the challengers of the regulation alleged that the state's pulpwood producers would benefit from the ban at the expense of out-of-state firms, the Supreme Court was unconvinced that the legislation had a protectionist purpose to provide more business to the state's pulpwood manufacturers or that it would impose any significant burden on out-of-state interests. Plastic manufacturers would still be providing plastic pouches and plastic returnable bottles and out-of-state pulpwood producers would absorb some of the business generated by the Act. *Id.* at 473, 101 S.Ct. 715. After finding in effect that the disparate impact was slight, the Court found that any burden that did result was outweighed by the substantial state interest in promoting conservation of energy and other natural resources and easing solid waste disposal problems.

The city's ordinance does not seem to fall into even the third category identified in *National Paint* of laws that affect commerce without giving local firms any competitive advantage. Plaintiffs have proposed no facts to suggest that the regulations would have any particular effect on interstate commerce. *Cf. Procter & Gamble Co. v. Chicago*, 509 F.2d 69, 76–78 (7th Cir.1975) (plaintiff soap manufacturer alleged that ban on phosphate detergents caused it to lose almost $5,000,000 in sales in five months and required expensive changes in its distribution system; court held that plaintiff failed to show that means chosen to accomplish a matter of local concern were not clearly ineffective and declined to overturn regulation). If plaintiffs had shown that the law had some effect on interstate commerce without producing any economic advantage for local firms, they would not prevail on their challenge to the law. In addressing laws that fall into this third category, the court's task is limited to determining whether the city had a rational basis upon which to legislate. It is not relevant to this determination that better ways might exist for attacking the problem or that the legislation does not resolve the entire problem. The challengers must show that the legislation is entirely baseless by refuting " 'every conceivable basis which might support' " the legislation. *National Paint*, 45 F.3d at 1127 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973)); *Payday Loan Store of Wisconsin v. City of Madison*, 333 F.Supp.2d 800, 804 (W.D.Wis.2004). Despite the extensive evidence that plaintiffs have marshaled in an effort to show that the enacted bans are unwise, ineffectual and misguided, they have not demonstrated the lack of *any* conceivable basis for the city's decision to take the steps it did. A program is not "clearly ineffective" if it does not resolve the entire problem it is designed to attack or even if it does not attack the problem in the most effective way.

2. *The county ordinance*

■ Unlike the city ordinance, the county ordinance makes a specific exemption from the phosphate ban for "yard waste compost, biosolids or other similar materials that are primarily organic in na-

ture and are applied to improve the physical condition of the soil." § 80.96(4). The exemption would apply to organic biosolids manufactured by local sewerage districts, such as the biosolid sold as Milorganite®, which is a product of the Milwaukee Metropolitan Sewerage District. Plaintiffs have seized on this exemption to argue that the county's passage of the ordinance was motivated by an intent to favor local products and local sewerage districts in particular. In their view, the "practical effect of the County Ordinances will be to force manufacturers and retailers of inorganic fertilizers containing phosphorus to comply with a multitude of conflicting regulations as a means of doing business in Wisconsin, while permitting producers and retailers of organic phosphorus fertilizers to maintain the status quo." Plts.' Br., dkt. # 10, at 24.

Plaintiffs' challenge falls short. Plaintiffs have failed to show that the ordinance was motivated by a protectionist purpose, that commercial lawn fertilizers and biosolids are competing products or that, if the ordinance has a discriminatory impact, the impact is not offset by the benefits that will accrue from the ordinance. The county ordinance exempts *all* biosolids, not just those produced within the state, and it imposes a no-phosphate requirement on *all* commercial lawn fertilizers, whether produced inside or outside Wisconsin. Although the evidence suggests that Milwaukee's sewerage district may be a leader in converting biosolids to lawn fertilizers it does not suggest that other districts would not follow suit if they saw a market for biosolid-lawn fertilizers. If, as plaintiffs fear, the demand for biosolids heats up in Dane County, out-of-state sewerage districts in nearby states will have an incentive to enter the market. It is unlikely that it would take them long to do so. Like the manufacturers of paper and pulp dairy containers in *Clover Leaf Creamery,* 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d

659, in-state treaters of sewage biosolids will not benefit from the ordinance more than other sewerage districts that choose to enter the market.

It is not even clear whether Milorganite® competes with commercial lawn fertilizers. (The parties agree that it caters to a "niche market.") Plaintiffs have offered no evidence of direct competition, although they have a stack of affidavits from persons holding themselves out as knowledgeable about all aspects of the fertilizer industry. Despite plaintiffs' acknowledgment that phosphorus-free commercial lawn fertilizers are available in Dane County, they have no evidence to indicate that homeowners or grounds keepers for private golf clubs turn to Milorganite® when they are unable to purchase commercial fertilizers containing phosphorus. It seems unlikely that such substitutions would occur, if only because commercial fertilizers supply the nitrogen needs of lawns with fewer applications and lesser effort. Plaintiffs have adduced no evidence that Milorganite® or any other kind of biosolids are blended with pesticides for sale so that they would compete directly with "weed and feed" fertilizers.

Implicit in the commerce clause's ban on discrimination between in and out-of-state products is the assumption that the competing products or the competing entities are substantially similar. *General Motors,* 519 U.S. at 298, 117 S.Ct. 811 ("Conceptually, of course, any notion of discrimination assumes a comparison of substantially similar entities.") In *General Motors,* the Court found no substantial similarity between the sellers of natural gas and local distribution companies. For this reason, it concluded that Ohio was not violating the commerce clause by exempting the distributors from the sales and use taxes imposed on the sellers. The two groups served different markets and would

continue to do so even if the tax differential were eliminated. *Id.* at 299, 117 S.Ct. 811.

Not only is there no proof that Milorganite® is a true competitor as far as no-phosphorus commercial lawn fertilizers are concerned, the record shows good reasons to treat it differently from commercial fertilizer. Unlike commercial fertilizers, biosolids are composed of existing waste that must be disposed of somewhere. Rather than incur the costs of yard and sewage waste disposal without achieving any offsetting benefit, the county has chosen to exempt the waste from the ban on fertilizers containing phosphorus and allow its use for soil amendment. This special exemption conforms to the provisions of the Clean Water Act, 35 U.S.C. § 1345(e), that encourage the beneficial use of municipal sewerage waste and with Wisconsin Department of Natural Resources regulations that provide that "the beneficial use of sewage sludge and its recycling to the land as a fertilizer or soil conditional is encouraged, rather than disposing of sludge through incineration or landfilling." Wis. Admin. Code § NR 204.01.

I conclude that the county's ordinance does not violate the commerce clause. Its purpose is not to protect local commercial interests, but to maintain and improve the water quality in the area's lakes and rivers. To the extent the ordinance has any disparate impact, that impact is offset by the benefits that will accrue from reducing the amount of phosphorus that enters the area's rivers and lakes from lawn and turf fertilizers.

### D. *Equal Protection*

Plaintiffs contend that the county ordinance violates equal protection because it allows biosolids containing phosphorus while banning phosphorus in commercial fertilizers. The parties agree that the county ordinances are subject to the rational basis test, that is, the statute will withstand constitutional challenge under the equal protection clause so long as the legislating body had some rational basis upon which to enact the law. Under this test, persons challenging legislation may introduce evidence supporting their claim that the legislature has acted irrationally but they cannot prevail so long as "'it is evident from all the considerations presented to [the legislature], and those of which we may take judicial notice that the question is at least debatable.'" *Clover Leaf Creamery*, 449 U.S. at 464, 101 S.Ct. 715 (quoting *United States v. Carolene Products Co.*, 304 U.S. 144, 153–54, 58 S.Ct. 778, 82 L.Ed. 1234 (1938)).

Plaintiffs maintain that the county ordinance flunks this generous standard of review because the county had no rational basis for its distinction between phosphate in commercial lawn fertilizers and phosphate in organic biosolids. Plaintiffs may be right that a different entity might have decided that banning just one source of phosphate makes no sense if others are allowed, but they cannot show the lack of *any* rational basis for the county's decision. It is not irrational to decide that banning phosphates in commercial fertilizers is an effective step toward preserving water quality even if people are still using biosolids to treat their lawns and golf courses. With the ban on commercial fertilizers containing phosphorus, manufacturers will have a diminished incentive to *add* phosphorus to their products. The ordinance will keep that additional phosphorus from entering the county's rivers and lakes. The biosolids exist and require disposal; it is not irrational for the county to prefer a form of disposal that provides a benefit in the process. Doing so is consistent with both federal and state law, *see* the Clean Water Act, 35 U.S.C. § 1345; Wis. Admin. Code, § 204.01. Using the treated waste for lawn fertilizer provides an incentive for treating the waste and

keeping it out of the waterways in its untreated form. The county board's choice of solutions may or may not be the best one possible, but it is not wholly irrational. That is the only issue I need to determine. Wisdom and efficacy are matters for the legislature.

■ Plaintiffs' equal protection challenge does not stop with the United States Constitution. They contend that the county ordinance violates the equal protection clause of the Wisconsin Constitution, Wis. Const., Art.1, § 1. They argue that organic biosolids and commercial fertilizers are not substantially distinct and that the county's differential classification of the two products is not germane to the purpose of the law. As I have explained however, for equal protection purposes, the county board could consider biosolids and commercial fertilizers distinct from one another and therefore subject them to different treatment. Doing so is not a violation of equal protection under the Wisconsin Constitution. "Absent similarity, disparate treatment does not present a claim under the equal protection clause of the fourteenth amendment, let alone a violation of equal protection." *Treiber v. Knoll*, 135 Wis.2d 58, 67 n. 5, 398 N.W.2d 756, 759 n. 5 (1987) (citing *Tigner v. Texas*, 310 U.S. 141, 147, 60 S.Ct. 879, 84 L.Ed. 1124 (1940); *Desris v. City of Kenosha, Wis.*, 687 F.2d 1117, 1119, 1121 (7th Cir. 1982)).

### E. *Due Process*

■ Plaintiffs challenge the city ordinance as being so vague as to be unconstitutional because its prohibitions are not defined clearly. Vague laws are problematic for two reasons: they do not give persons of ordinary intelligence fair warning of what they must do or refrain from doing to avoid violating the law and they permit arbitrary and discriminatory enforcement by not giving police officers, judges and juries sufficient guidance in the way of explicit standards. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

The alleged defects are make weights, now that the ordinance has been amended to eliminate questions about definitions. The ordinance is not ambiguous, as plaintiffs argue, because it describes its purpose as being the protection of the area's waters "without detracting from the natural beauty of homeowners' lawns and gardens," but prohibits the application of fertilizers to lawns while allowing it on gardens and makes it illegal to apply or deposit *any* fertilizer on an impervious surface. Obviously, the city council decided that lawns would keep their "natural beauty" without phosphorus and outlawed the application of *any* fertilizer on an impervious surface because it would run off immediately into the street and from there into the storm sewers and into the lakes. Persons of ordinary intelligence can understand all of this.

The ordinance is not ambiguous because it bans the display of fertilizers containing phosphorus "when the retail sale is to a resident of the City of Madison," without explaining how a retail establishment can legally create a display for non-city residents while complying with this provision of the ordinance. The city deleted this provision from the ordinance after the county adopted its ordinance. Also, the city amended § 7.48(7) in February 2005 to define when the exemption to the phosphorus ban would apply to lawns in need of phosphorus. The ordinance now provides that the ban does not apply

> when a tissue, soil or other test by UW–Extension Laboratory or other state-certified laboratory and performed within the last three years indicates that the level of available phosphorus in the soil is insufficient to support healthy turf

growth, as determined by the University of Wisconsin Extension Service, provided that the proposed lawn and turf fertilizer application shall not contain an amount of phosphorus exceeding the amount and rate of application recommended in the soil test evaluation.

Finally, plaintiffs contend that the ordinance is ambiguous because it prohibits the application of lawn fertilizer when "conditions exist which promote or create runoff." City Ordinance § 7.48(5). Even this provision fails the vagueness test. Most people of common intelligence can tell when runoff conditions are present. If a homeowner is in doubt, she can run water from a hose to test the conditions. If the water runs down the yard and into the street without soaking into the ground or if it is blown by high winds, the homeowner would have her answer. (It is fair to assume that grounds keepers at golf courses would not need instruction in runoff.)

### E. *Freedom of Speech*

■■■■ Plaintiffs's last challenge focuses on the ordinances' restrictions on the commercial display of fertilizers containing phosphorus. They maintain that the ordinances violate their right to free speech under the First Amendment of the United States Constitution. Although they acknowledge that the level of judicial scrutiny given to commercial speech is less than that given to noncommercial speech, plaintiffs note that less scrutiny does not mean no scrutiny. Commercial speech is entitled to protection if it is lawful and not misleading, but regulations proscribing such speech will be upheld if they advance substantial interests of the government and do so in a "direct and material" manner and the extent of the restriction is "in reasonable proportion to the interests served." *Edenfield v. Fane*, 507 U.S. 761, 767, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993). Plaintiffs contend that defendants cannot establish the required close fit between the restrictions the ordinances place on commercial speech and the goals the ordinance promotes, *Lavey v. City of Two Rivers*, 171 F.3d 1110, 1114 (7th Cir.1999), because defendants cannot prove that banning displays of fertilizers containing phosphorus will have any positive effect on water quality.

■■■■ Plaintiffs' argument fails at the outset because the commercial speech at issue is not entitled to protection. Plaintiffs are complaining about their inability to display commercial lawn fertilizers containing phosphorus; they have no constitutional right to display such fertilizers if it is unlawful to sell them. The dissemination of information receives no protection unless it concerns a lawful activity and is not misleading. *Central Hudson Gas & Electric Corp. v. Public Service Commn. of New York*, 447 U.S. 557, 563, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) ("there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity"). Plaintiffs are free to display signs advising customers that lawn fertilizers containing phosphorus are available upon request for uses permitted by § 80.06 of the county's ordinance and they are free to display fertilizers containing phosphorus for application to gardens, trees or shrubs. The only restriction is on their display of lawn fertilizers that they cannot sell lawfully.

Moreover, the ordinances have a substantial governmental interest (the protection of water quality); the regulation advances this interest directly even if plaintiffs disagree that it advances the interest in the most effective way; and it is narrowly drawn. *Edenfield*, 507 U.S. at 767, 113 S.Ct. 1792.

## ORDER

IT IS ORDERED that the motion for summary judgment filed by plaintiffs Croplife America, Inc., RISE, Berry Hill Farms, Inc., America's Best Flowers Garden Center, Wisconsin Fertilizer & Chemical Association, Landmark Services Cooperative, Midwest Hardware Association, Keyman Lawn Care, LLC, Midwest Lawn Care, LLC and Wisconsin Landscape Federation is DENIED; the motion for summary judgment filed by defendants City of Madison, Kathryn N. Vedder, Michael May, Dane County, Kathleen Falk and Lynn Green is GRANTED. The clerk of court is directed to enter judgment for defendants and close this case.

## APPENDIX

**920**

CHAPTER 80
ESTABLISHING REGULATIONS
FOR LAWN FERTILIZER
APPLICATION AND SALE

80.01   Authority.
80.02   Purpose And Intent
80.03   Applicability.
80.04   Definitions.
80.05   Regulation Of The Use And Application
        Of Law Fertilizer.
80.06   Exemptions.
80 07   Sale of Fertilizer Containing Phos-
        phorus.
80.08   Enforcement.
80.09   Penalty.
80.10   Severability Clause.

**80.01   AUTHORITY.** This chapter is recommended by the Dane County Lakes and Watershed Commission and adopted by the Dane County Board of Supervisors under the authority of sec. 33.455, Wis. Stats

**80.02   PURPOSE AND INTENT.** The Dane County Board of Supervisors finds that Dane County's lakes and streams are a natural asset, which enhance the environmental, recreational, cultural and economic resources of the area and contribute to the general health and welfare of the public.   The Board further finds that regulating the amount of nutrients and contaminants, including phosphorus contained in fertilizer, entering the lakes will improve and maintain lake water quality.

**80.03   APPLICABILITY. (1)** This ordinance applies in all areas of Dane County.
**(2)** Cities and villages wholly or partially in Dane County may assume administration and regulation of lawn fertilizer application and sale if they have adopted ordinances that include standards at least as restrictive as those described in ss. 80.05 – 80.09.

**80.04   DEFINITIONS. (1)** *Agricultural use* has the meaning set forth in sec. 10.01(2a).
**(2)** *Fertilizer* has the meaning set forth in sec. 94.64(1)(e), Wis. Stats.
**(3)** *Lawn fertilizer* means any fertilizer, whether distributed by property owner, renter or commercial entity, distributed for nonagricultural use, such as for lawns, golf courses, parks and cemeteries   *Lawn fertilizer* does not include

fertilizer products intended primarily for garden and indoor plant application

**80.05   REGULATION OF THE USE AND APPLICATION OF LAWN FERTILIZER. (1)** Effective January 1, 2005, no person shall apply any lawn fertilizer within Dane County that is labeled as containing more than 0% phosphorus or other compound containing phosphorus, such as phosphate, except as provided in section 80.06.
**(2)** No lawn fertilizer shall be applied when the ground is frozen
**(3)** No person shall apply fertilizer to any impervious surface including parking lots, roadways, and sidewalks.   If such application occurs, the fertilizer must be immediately contained and either legally applied to turf or placed in an appropriate container.

**80.06   EXEMPTIONS.** The prohibition against the use of fertilizer under section 80.05 shall not apply to:
**(1)** Newly established turf or lawn areas during their first growing season.
**(2)** Turf or lawn areas that soil tests, performed within the past three years by a state-certified soil testing laboratory, confirm are below phosphorus levels established by the University of Wisconsin Extension Service.   The lawn fertilizer application shall not contain an amount of phosphorus exceeding the amount and rate of application recommended in the soil test evaluation.
**(3)** Agricultural uses, vegetable and flower gardens, or application to trees or shrubs.
**(4)** Yard waste compost, biosolids or other similar materials that are primarily organic in nature and are applied to improve the physical condition of the soil.

**80.07   SALE OF FERTILIZER CONTAINING PHOSPHORUS. (1)** Effective January 1, 2005, no person shall sell or offer for sale any lawn fertilizer within Dane County that is labeled as containing more than 0% phosphorus, or other compound containing phosphorus, such as phosphate, except such fertilizer may be sold for use as provided in section 80.06.
**(2)** Effective January 1, 2005, no person shall display lawn fertilizer containing phosphorus. Signs may be posted advising customers that lawn fertilizer containing phosphorus is available upon request for uses permitted by s. 80.06.

(3) Effective May 1, 2004, a sign containing the regulations set forth in this ordinance and the effects of phosphorus on Dane County's waters must be prominently displayed where lawn fertilizers are sold.

**80.08 ENFORCEMENT.** Violations of this ordinance will be enforced by the Environmental Health Section of the Public Health Division, Department of Human Services.

**80.09 PENALTY.** Any person who violates section 80.05 in the application of fertilizer at his or her residence shall be subject to a forfeiture of $25 per violation. Any commercial fertilizer applicator, residential or commercial developer, industrial or commercial owner, or other person who violates section 80.05, and any person who violates section 80.07, shall be subject to a forfeiture of $50 for the first violation within a twelve month period, $150 for the second violation within a twelve month period, and $300 for the third and each subsequent violation within a twelve month period.

**80.10 SEVERABILITY CLAUSE.** If any section, provision or portion of this ordinance is ruled invalid by a court, the remainder of the ordinance shall not for that reason be rendered ineffective or invalid.

[HISTORY: Ch 80 (sec. 80.01 through 80.10) cr . Sub 1 to OA 33, 2003-04, pub. 04/30/04.]

## END OF CHAPTER

## APPENDIX—Continued

# AGENDA #_____

## CITY OF MADISON, WISCONSIN

AN AMENDED 2ND SUBSTITUTE
ORDINANCE _____

amending Section 7.48 of the Madison General Ordinances by prohibiting the sale, display and application of lawn and turf fertilizer containing phosphorus and amending Section 1.08(3)(a) of the Madison General Ordinances to establish a bail deposit amount for violations of Section 7 48.

Drafted by·  James M. Voss
              Acting City Attorney

Date          February 3, 2004

Fiscal Note:  No appropriation is required.
              There is no anticipated impact
              upon the tax levy

SPONSORS      Alds Markle, Golden, Verveer
              and Webber

PRESENTED     September 2, 2003
REFERRED      Comm. on Environment,
Public Health Comm , Park Comm.; EDC
REREFERRED    Comm on Environment;
Public Health Comm.; Park Comm ; EDC
(10/21/03, 12/2/03)
REPORTED BACK    10/21/03; 12/2/03;
1/20/04, 2/3/04

ADOPTED    X _____        POF _____
RULES SUSPENDED    _____
PUBLIC HEARING     _____

APPROVAL OF FISCAL NOTE IS NEEDED
BY THE COMPTROLLER'S OFFICE
Approved By

_____
Comptroller's Office

AMENDED 2ND SUB ORD NUMBER   **13532**
        ID NUMBER                34613

ANALYSIS: The intent of the ordinance revision is to regulate the application, sale and display of lawn and turf fertilizer containing more than a trace of phosphorus with exceptions for ~~parkland restoration, golf courses,~~ new lawns, and phosphorus deficient soil.

The Common Council of the City of Madison do hereby ordain as follows:

1.      Section 7.48 entitled "Regulations on the Sale and Use of Fertilizers" of the Madison General Ordinances is amended to read as follows:

"7.48   REGULATIONS ~~ON~~ OF THE SALE, APPLICATION AND USE OF FERTILIZERS.
   (1)  Purpose. The Common Council finds that the Madison lakes are natural assets which enhance the environmental, recreational, cultural and economic resources of the Madison area and contribute to the general health and welfare of the public. The Common Council further finds that Madison lake water quality may be maintained and improved if the City is able to regulate the amount of nutrients and contaminants including phosphorus contained in fertilizer entering the Madison lakes as a result of runoff from lawns and turf. The purpose of this ordinance is to set forth regulations which will enable the City to protect its water resources for the health, safety, and welfare of the public without detracting from the natural beauty of homeowners' lawns and gardens.
   (2)  Definitions
            "Distribute" has the meaning specified under sec. 94.64(1)(d), Wis. Stats.
            "Fertilizer" has the meaning specified under sec. 94.64(1)(e), Wis. Stats.
            "Impervious surface" means a highway, street, sidewalk, parking lot, driveway, or other material that prevents infiltration of water into the soil.
            "Lawn and Turf Fertilizer" has the meaning specified under sec. 94.64(1)(e), Wis. Stats., except the manufacturer has designated the product to be used for the promotion of lawn and turf growth.

12/15/04 Http //www o madison w· us/council/34613amendedsub/ doc
03/SPP-#33-1273

Approved as to form:

_____/s/_____
James M. Voss, Acting City Attorney

"Person" means any individual, firm, corporation, franchise, partnership, limited liability company or any other entity.

"Pesticide" means a substance or mixture of substances intended to prevent, destroy, repel, or mitigate a pest, and a substance or mixture of substances intended for use as a plant regulator, defoliant or desiccant.

"Phosphorus" means a chemical element used as a plant nutrient.

"Plant nutrient" has the meaning specified under sec. 94.64(1)(p), Wis. Stats.

"Trace" means less than 0.5% by weight.

"Turf" means noncrop land planted in closely mowed, managed grasses including, but not limited to, residential and commercial residential property, private golf courses, and property owned by federal, state, or local units of government, including parks, recreation areas, and public golf courses. Turf does not mean pasture, hayland, hay, turf grown on turf farms, or any other form of agricultural production.

(3) It shall be unlawful for any person to apply within the City any lawn and turf fertilizer, liquid or granular, that contains more than a trace of phosphorus or other compound containing phosphorus, such as phosphate.; firm or corporation to sell, give away or distribute in any manner, any fertilizer, soil or plant nutrient or herbicidal compound for lawn, shrub, tree or garden use without providing to the consumer at the time of sale an approved City of Madison informational sheet.

(2) The information sheet shall contain the following information:

(a) A statement that fertilizers, plant nutrients or herbicidal compounds lost through careless, improper or excessive application to lawns, shrubs, trees or gardens can contribute to lake and stream problems by promoting excessive growths of aquatic vegetation or otherwise be harmful to aquatic life.

(b) A listing of precautions that should be taken when applying fertilizers to lawns and gardens.

(c) A statement that soil tests are a practical way of telling whether fertilizers are needed and or determining what quantities should be applied in order to obtain maximum benefits and minimum fertilizer losses.

(d) Information relative to sources of instructions on methods of sampling lawns and gardens for soil testing.

(e) Information relative to the availability of public soil testing services.

(f) Information relative to where assistance might be obtained in interpreting soil test results.

(g) Other pertinent information that might result in limiting or decreasing the quantities of fertilizers and associated materials escaping to the lakes and streams through the storm water system.

(h) Subsection (1), Subsection (4), and Subsection (5) of the ordinance.

(3) The informational sheet shall be prepared by the Madison Department of Public Health and reviewed and revised annually by the department and the Rivers and Lakes Commission and made available to concerned parties by January 1 of each year. The informational sheet shall be given to the consumer at the time of sale of any fertilizers, plant nutrients or herbicidal compounds.

(4) It shall be unlawful for any person, firm or corporation to apply or use deposit any fertilizer on an impervious surface. If such application occurs, the fertilizer must be immediately contained and either legally applied to turf or any other lawful site, or returned to the original or other appropriate container., plant nutrient or herbicidal compound in such a manner as to cause deposition of such products on sidewalks, driveways or roadways where such products can be washed into the storm sewerage system without promptly cleaning such materials from said areas. The cleaning shall be done in such a manner so that the products are not washed into the storm sewer system.

(5) The Public Health Department shall make available copies of Subsection (1) and Subsection (4) suitable for posting at the retail outlet. Time of Application. It shall be unlawful for a person to apply lawn and turf fertilizer when the ground is frozen or when conditions exist which promote or create runoff.

## APPENDIX—Continued

(6) ~~The provisions of this ordinance shall become effective January 1, 1975.~~ It shall be unlawful for any person to display or distribute for retail sale lawn and turf fertilizer containing more than a trace of phosphorus. This prohibition shall apply to the fertilizer content of a product that combines fertilizer with a pesticide. This prohibition shall only apply when the retail sale is to a resident of the City of Madison.

(7) Exceptions.
    (a)    Subsection (3) shall not apply when
        1.    a tissue, soil or other test by UW-Extension Laboratory or another approved soil-testing laboratory and performed within the last three years indicates that the levels of available phosphorus in the soil is insufficient to support healthy turf growth;
        2.    the property owner or an agent of the property owner is first establishing or re-establishing turf via seed or sod procedures, and only during the first growing season.
    (b)    Any person who applies a lawn and turf fertilizer containing phosphorus pursuant to the aforementioned exceptions shall water such lawn and turf fertilizer into the soil where it is immobilized and generally protected from loss by runoff.
    (c)    Subsection (6) regarding the prohibition of the distribution of lawn and turf fertilizer containing phosphorus shall not apply when the customer states:
        1    a tissue, soil or other test by UW-Extension Laboratory or another approved soil-testing laboratory and performed within the last three years indicates that the levels of available phosphorus in the soil is insufficient to support healthy turf growth,
        2    the property owner or an agent of the property owner is first establishing or re-establishing turf via seed or sod procedures, and only during the first growing season;

(8) Severability. Any provision of this section which shall prove to be invalid, void, or illegal shall in no way affect, impair, or invalidate any other provision hereof and the remaining provisions hereof shall nevertheless remain in full force and effect.

(9) Penalty. Any person who violates this ordinance shall pay a forfeiture of not less than twenty-five dollars ($25) nor more than three hundred dollars ($300) for each offense.

(10) Effective Date. The provisions of this ordinance shall become effective January 1, 2005."

2. Subdivision (a) of Subsection (3) entitled "Schedule of Deposits" of Section 1.08 entitled "Issuance of Citations for Violations of Certain Ordinances and Providing a Schedule of Cash Deposits" of the Madison General Ordinances is amended by adding therein the following:

| "Offense | Ord. No. | Deposit |
|---|---|---|
| Regulation of fertilizer | 7.48 | $50, 1st within 12 months<br>$150, 2nd within 12 months<br>$300, 3rd & subsequent within 12 months" |

12/15/04-http://www.o.madison.wi.us/council/3481/3amendedsub2.doc
03rSPP#03-1273